IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WARREN PUBLISHING COMPANY and | : | |
| JAMES WARREN, | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | No. 08-3399 |
| J. DAVID SPURLOCK d/b/a | : | |
| VANGUARD PRODUCTIONS, | : | |
| Defendant. | : | |

## MEMORANDUM RE: MOTIONS FOR SUMMARY JUDGMENT

**Baylson, J.**                                                   **August 4, 2009**

## TABLE OF CONTENTS

I.     Background and Procedural History ........................................ 2

       A.    History of Warren Publishing and Magazine Publications ................. 2

       B.    Magazine Cover Art and Basil Gogos ................................... 2

       C.    Basil Gogos Art Book ................................................ 3

       D.    Description and Ownership of the Illustrations Reproduced in the Gogos Book  . 4

       E.    Plaintiffs' Legal Claims ............................................. 8

       F.    Procedural History .................................................. 9

II.    Jurisdiction and Legal Standard .......................................... 10

       A.    Jurisdiction ....................................................... 10

       B.    Legal Standard ..................................................... 11

III.  Copyright Infringement Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    A.  Ownership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        1.  Ownership of the Gogos Artwork . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        2.  Ownership of the Magazine Copyrights . . . . . . . . . . . . . . . . . . . . . . . . 17

        3.  Ownership of Eerie and Creepy Copyrights . . . . . . . . . . . . . . . . . . . . . . 18

    B.  Fair Use Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        1.  Fair Use on Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        2.  Factor 1 – Purpose and Character . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

            a.  Transformative Nature . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

            b.  Analogous Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

            c.  Bad Faith . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        3.  Factor 2 – Nature of the Plaintiff's Work . . . . . . . . . . . . . . . . . . . . . . . . 33

        4.  Factor 3 – Amount and Substantiality Used . . . . . . . . . . . . . . . . . . . . . . 35

        5.  Factor 4 – Effect on Potential Market Value . . . . . . . . . . . . . . . . . . . . . . 38

        6.  Consideration of All Fair Use Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

IV.  Unfair Competition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

    A.  Principles of Analyzing Unfair Competition Claim . . . . . . . . . . . . . . . . . . . . . . 45

    B.  Principles Under the Lanham Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

    C.  Third Party Ownership of the Mark . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

    D.  Abandonment of the Mark . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

        1.  Principles on Doctrine of Abandonment . . . . . . . . . . . . . . . . . . . . . . . . 54

        2.  Cases Relied on by Spurlock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

        3.  Whether Lanham Act Prima Facie Abandonment Presumption Applies . 57

   4.  Cases Relied on by Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

   5.  Evidence Offered by Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

   6.  Unfair Competition Claim on the Basis of Abandoned Mark . . . . . . . . 72

V.  Plaintiffs' Motion for Sanctions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

VI.  Motions Concerning the Experts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Monsters have a long history and high standing in the realm of cultural niches. From Goliath in the Bible, to Charybdis and Scylla in Homer, to Count Dracula, the genre of monsters has many admirers. Considering modern media, monsters and movies are a likely pairing. Celluloid dexterity can illustrate—better than any selection of words—heightened emotions, sudden movements, special effects, and whatever "scariness" a fan of monsters desires. The Irish playwright and poet Oscar Wilde wrote:

> Pathology is rapidly becoming the basis of sensational literature, and in art, as in politics, there is a great future for monsters.[1]

Many years ago, Plaintiff James Warren published several magazines that catered to the movie monster audience, which was primarily composed of young males. On the cover of each of his magazines, he featured movie monster artwork from many artists, including Basil Gogos. More recently, Defendant J. David Spurlock produced a book that is a career retrospective and biography of Basil Gogos. Twenty-four copies of Gogos artwork, which were previously used by Warren for the magazine covers, are used in the book as illustrations and form the basis of Plaintiffs' primary claim of copyright infringement.

Although the evidence is not clear that Plaintiffs have ownership rights to all of the artwork that is the subject matter of this suit, the Defendant is willing to assume Plaintiffs' ownership rights for purposes of the pending motions for summary judgment. But even assuming ownership, the affirmative defense of fair use requires the Court to grant summary judgment in favor of Spurlock on the copyright claim. And, because this Court concludes that the evidence, viewed in the light most favorable to Plaintiffs, shows that Plaintiffs have

---

[1] Saturday Review, May 7, 1887.

abandoned the <u>Famous Monsters of Filmland</u> mark, the Court will also grant summary judgment on Plaintiffs' common law unfair competition claim.

## I.   **Background and Procedural History**

### A.   **History of Warren Publishing and Magazine Publications**

Plaintiffs in this case are James Warren ("Warren") and the Warren Publishing Company ("Warren II"), of which James Warren is the president and sole shareholder.  A different company with the same name ("Warren I") was dissolved in 1974.  James Warren was also the sole shareholder of Warren I, which printed and distributed several magazines and comic books in the horror and monster film genre.  Warren I first published a magazine entitled <u>Famous Monsters of Filmland</u> ("<u>Famous Monsters</u>") in 1958.  Each issue was at least 68 pages long, catered to fans of the movie monster genre, and regularly featured articles, photographs, reviews, fan letters, and artwork that all focused on this increasingly popular topic.  Two other publications that are at issue here, entitled <u>Creepy</u> and <u>Eerie</u>, were also published by Warren I, and were of a similar nature.  Warren asserts that as soon as the magazines went to print, Warren I applied for and received a registered copyright for each issue.  Warren provides copyright registration numbers for each issue in contention in this suit, asserting that each registration number establishes his current ownership.

### B.   **Magazine Cover Art and Basil Gogos**

Warren commissioned many freelance artists to create images of movie monsters to display on the magazine covers.  Basil Gogos ("Gogos") is one artist who designed cover art for Warren I.  His work appeared on the covers of 51 of the 191 issues of <u>Famous Monsters</u> (more than any other artist), as well as the covers of at least two of Warren I's other serial publications,

Creepy and Eerie.  Gogos was a freelance artist at the time Warren commissioned his works, and there is some dispute between the parties as to who retained ownership of the underlying artwork. Warren argues that Gogos, like other freelance artists hired to design covers, sold all rights to his artwork to Warren I.  Spurlock, on the other hand, contends that Gogos retained ownership over his art and only sold to Warren I a license for a one-time use of the art.  The issue will be more thoroughly discussed below.  In any event, Warren I filed for bankruptcy and dissolved in 1974.

### C.   **Basil Gogos Art Book**

Defendant, J. David Spurlock ("Spurlock"), is the sole proprietor of the publishing company Vanguard Productions.  Spurlock claims that in 2004, he approached Warren about the idea of collaborating on a career retrospective of Basil Gogos.  Gogos spent a significant part of his career designing covers for Warren I, and Spurlock believed that a career retrospective about Gogos and his art would be inadequate without acknowledgment of the period when Gogos designed covers for Warren I.  While there is some dispute over the substance of these negotiations, Warren and Spurlock never came to an agreement on the project.

Spurlock, however, continued to pursue the idea, and in May 2005, he finalized a deal with Gogos to compile and publish the book.  In March 2006, Spurlock began selling the book, entitled Famous Monster Movie Art of Basil Gogos ("Gogos Book").  Spurlock contends that the book is a work of scholarship that "carefully and respectfully illustrate[s] the vast output and evolution of the artist."

Spurlock included reproductions of Gogos's art in the book that can be grouped into two types:  (a) fourteen images used in the Gogos Book are reproductions of original art by Gogos that were used by Warren as background illustrations for the covers of Plaintiffs' publications,

but these images were not reproductions of the magazine covers that used the art; (b) ten images used are exact reproductions[2] of covers from issues of Plaintiffs' magazines that utilized Gogos art, including the text that was displayed on top of the artwork; and (c) images with no relation to Plaintiffs' magazines. Categories (a) and (b) will be more thoroughly discussed in the following section. In total, the book contains over 160 reprints of Basil Gogos's artwork, twenty four of which were from Famous Monsters, Creepy, or Eerie. The book is in its third printing and has sold 11,000 copies. Spurlock has personally profited from the book's publication, which at one point was priced at $250.

**D.     Description and Ownership of the Illustrations Reproduced in the Gogos Book**

Plaintiffs' Famous Monsters magazine was published over a number of years, from 1958 to 1983, for a total of 191 issues. Spurlock's book, entitled "Famous Monster Movie Art of Basil Gogos," was first offered for sale in March 2006.

Plaintiffs claim twenty-four separate instances of copyright infringement. Of the ten images that are exact reproductions of the entire magazine covers (listed on the chart below), which include the text of the cover, it appears that only seven[3] of the illustrations are reproductions of the actual covers of Plaintiffs' Famous Monsters magazine.[4] There is one image

_____

[2] One of the ten covers was only reproduced in the first edition of the Defendant's book, as discussed in more detail below.

[3] While Spurlock makes reference to six instances throughout the briefing, that was later corrected during the oral argument. (Oral Arg. 49:9-10) ("And, Your Honor, [Plaintiffs' counsel] corrected me, and I'm wrong. Let's make it seven.").

[4] While six of these instances are consistent across editions of the Gogos Book, at oral argument Plaintiffs highlighted the fact that the allegedly infringing illustration for one of the claims, Count 19, which concerns the cover of Famous Monsters #135 (depicting Godzilla

that reproduces the cover of a copyrighted <u>Creepy</u> magazine published by Plaintiffs, and two images that are reproductions of two copyrighted <u>Eerie</u> magazine covers.[5]  The remaining fourteen claims of infringement by Plaintiffs concern Gogos artwork that contain no printing or other detail, on their face, that would identify them as covers of Plaintiffs' magazines; these illustrations in the book consist of only the artwork that Gogos provided for the magazine cover, absent the text later inserted on the cover of the magazine.  Although this artwork was depicted on the cover of Plaintiffs' magazine, the fact that Spurlock's book only uses the original artwork, rather than the copyrighted magazine covers, prevents an automatic conclusion that Spurlock infringed Plaintiffs' copyrights.[6]  The issue of whether Plaintiffs also own the rights to the underlying artwork is, in the final analysis, moot because Spurlock concedes Plaintiffs' ownership for purposes of the pending motions and because summary judgment will be granted on the fair use defense.  Nonetheless, these facts are relevant to the Court's analysis and will be discussed.

The deposition testimony shows that Spurlock did admit to copying the ten works used as covers—seven works directly from the <u>Famous Monsters</u> magazine covers, two works from the

---

fighting the Bionic Monster), is different across editions.  As Plaintiffs noted, "the defendant changed the book afterwards in the second and third printings.  The first printing had a full-blown reproduction of the cover of <u>Famous Monsters</u>, along with the cover art that we assert belong to plaintiffs." (Oral Arg. 48:4-8).

[5] The two illustrations from the <u>Eerie</u> magazine that are the focus of the last two counts of copyright infringement, <u>Eerie</u> No. 26 and <u>Eerie</u> No. 30, were not included in the general pages of the book, but were instead part of a "bonus section that came with the deluxe slip case hard cover edition of the book." (Pl.'s Mot. Summ. J. Ex. 4 at 117:9-13).

[6] As these facts are disputed, if Plaintiffs' ownership was determinative, trial would be necessary on the issue of ownership.

Eerie magazine covers, and one work from a Creepy magazine cover—by using modern computer technology to digitally scan them.[7]  However, the facts of record as to the method by which the other fourteen illustrations were secured are not clear.  Plaintiffs, though having moved for partial summary judgment on the issue of infringement, have not met their burden of showing no genuine issues of fact as to this second set of illustrations.  There is some testimony that Spurlock obtained the art from an individual who "pilfered" it from Plaintiffs' trash dumpster, which may indicate that Warren intended to abandon the artwork, and other testimony that Spurlock copied the art directly from the current owner of the original painting.[8]  Even assuming the artwork was derived from a copy of Plaintiffs' magazines, the fact that Spurlock placed the illustration in the Gogos Book in the form of the original artwork, as opposed to an exact copy of the covers, prevents this Court from finding infringement as a matter of law.  A more extensive legal discussion concerning the ownership of Gogos's artwork will be presented below.

As with using words to describe any work of illustrative art, the task of describing the Gogos artwork at issue in this case is difficult.  These colorful illustrations call for the use of

---

[7] (Spurlock Dep. 98:13-16) ("If it's got type on it, it came from the actual printed magazine, and we, you know, took those on loan from some collector who had it in their collection."); (Spurlock Dep. 99:3-4) ("Q:  And then what – what happened?  A:  They're scanned.").

[8] (Spurlock Dep. 97:24-98:6) ("The answer to every original painting from that era is going to be the answer I've given you before.  It's either going to be from – if we were able to track down someone who owns the original to this day, either there or from an old transparency from Theakston."); (Spurlock Dep. 81:2-23) ("My understanding is that, after the bankruptcy officials sorted through the Warren offices, looking for anything that they could auction off when Warren Publishing was forced out of business through bankruptcy, that whatever was deemed of no value was discarded into the dumpster and that Theakston sometime later explored that dumpster and retrieved some items for his own possession.").

colorful adjectives.  The artwork of Basil Gogos, particularly to the extent that it portrays monsters and the genre of monsters, could be characterized as lurid, expressive, scary, haunting, disfigured—and a dictionary of synonyms could he consulted to round out this list.  In addition, the colors are very expressive, consisting of dramatic use of greens, yellows, reds—all colors that do not appear in the face of a normal human being, but, according to monster legend, are commonly found in the faces of monsters.

The chart below will allow a cross reference to the seven reproduced covers from the Famous Monsters magazine, the one cover from the Creepy magazine, and the two covers from the Eerie magazine.[9]

| Claim of Pls.' Am. Compl. | Def.'s Ex. No. | Magazine - Issue - Date - Bates No. | Page Where Illustration Appears in Gogos Book | Summary of Change |
|---|---|---|---|---|
| 1 | 8B | Famous Monsters #23 June 1963, Bates No. W0045 | Gogos Book, page 21 | more vibrant color* and reduced size |
| 6 | 13B | Famous Monsters #60 December 1969, Bates No. W00846 | Gogos Book, page 72 | more vibrant color and reduced size |
| 7 | 14B | Famous Monsters #62 February 1970, Bates No. W00414 | Gogos Book, page 74 | almost full size more vibrant color |

---

[9] It is also important to note that the Gogos Book contains at least three additional illustrations that are copies of other Famous Monster covers, but which Plaintiffs have not included in their Amended Complaint as the subject of copyright infringement claims.  These three illustrations are copies of Famous Monsters of Filmland covers from April 1961, No. 11, appearing at page 12 of the Gogos Book; November 1960, No. 9, appearing at page 18 of the Gogos Book; and a reduced copy of a cover from November 1980, No. 169, appearing at page 91 of the Gogos Book (which is placed beside another cover, from issue No. 63, that is the subject of one of the claims).  Plaintiffs do not explain these omissions.

| Claim of Pls.' Am. Compl. | Def.'s Ex. No. | Magazine - Issue - Date - Bates No. | Page Where Illustration Appears in Gogos Book | Summary of Change |
|---|---|---|---|---|
| 4 | 11B | Famous Monsters #58 October 1969, Bates No. W00710 | Gogos Book, page 76 | more vibrant color and reduced size |
| 17 | 24B | Famous Monsters #115 April 1975, Bates No. W01649 | Gogos Book, page 82 | almost full size more vibrant color |
| 8 | 15B | Famous Monsters #63 March 1970, Bates No. W00982 | Gogos Book, page 90 | more vibrant color and reduced size |
| 19 | 26B | Famous Monsters #135 July 1977, Bates No. W01801 | Gogos Book, page 91, first edition only | almost full size more vibrant color |
| 21 | 38B | Creepy #39 May 1971, Bates No. W00301 | Gogos Book, page 88 | approximate ½ size and more vibrant color |
| 23 | 39B | Eerie #26 March 1970, Bates No. W02062 | Deluxe slip case hard cover | approximate ½ size and original color |
| 24 | 40B | Eerie #30 November 1970, Bates No. W02130 | Deluxe slip case hard cover | approximate ½ size and original color |

*The statement about "more vibrant color" may reflect age and/or consequences of copying into the Appendix filed with the Court; the magazine covers, when they first appeared, may have been just as vibrant as Spurlock's reproductions. This term is merely descriptive and has no legal consequence.

**E.**   **Plaintiffs' Legal Claims**

Plaintiffs bring two causes of action in their Second Amended Complaint. The first count

consists of twenty-four claims of copyright infringement —one claim for each image that Spurlock used from Warren's magazines. In addition, Plaintiffs bring a Pennsylvania common law claim of unfair competition. Plaintiffs contend that the title of the book, Famous Monster Movie Art of Basil Gogos, along with the copied images of the artist's work, is a misappropriation of the goodwill and valuable recognition developed by Plaintiffs' <u>Famous Monsters</u> magazine. Plaintiffs allege that this title is similar enough to <u>Famous Monsters of Filmland</u> to improperly suggest to consumers that the Gogos Book is in someway related to, or endorsed by, Plaintiffs' popular magazine.

Plaintiffs seek a declaration of copyright infringement and unfair competition, a permanent injunction preventing future infringement of Plaintiffs' copyrights and future unfair competition, an order requiring the recall of Spurlock's allegedly infringing material, an order requiring the destruction of the allegedly infringing material with a subsequent report, statutory damages, Plaintiffs' costs including attorneys' fees, pre- and post-judgment interest, and punitive damages.

**F.    <u>Procedural History</u>**

Warren Company II and James Warren filed the initial complaint against Vanguard Productions, Inc. on July 21, 2008 alleging thirty-six claims of copyright infringement pursuant to the Copyright Act of 1909, 17 U.S.C. §§ 1 et seq. (Doc. 1). Plaintiffs later filed an Amended Complaint, which is the operative complaint for purposes of the pending motions, against J. David Spurlock d/b/a Vanguard Productions on January 14, 2009, instead alleging twenty-four claims of copyright infringement, as well as the Pennsylvania state law claim of unfair competition. (Doc. 29).

After extensive discovery, including several discovery disputes that the parties eventually resolved with the Court's assistance, the parties filed several motions, which are currently before the Court. First, Spurlock filed a Motion to Preclude Plaintiffs' use and/or Reliance Upon the Expert Report and Testimony of Plaintiffs' "Rehuttal" Expert Witness - Denis Kitchen on May 12, 2009. (Doc. 48). Two days later, on May 14, 2009, Spurlock also filed a Motion for Summary Judgment on all of Plaintiffs' claims. (Doc. 51). Plaintiffs then filed their own Motion for Partial Summary Judgment and for Sanctions (Doc. 49) and a Motion to Preclude Defendant's Use and/or Reliance Upon the Expert Report and Testimony of Jeffrey Rovin (Doc. 50) on May 14, 2009. After Plaintiffs responded to Spurlock's Motion to Preclude on June 2, 2009 (Doc. 56), responses to the other motions were all filed on June 11, 2009 (Doc. 58, 59, 60, 61, 62).

On June 25, 2009, this Court held oral argument on all of the outstanding motions. (Doc. 72-74). After a productive discussion on the issues with the parties, both sides filed supplemental briefs on July 10, 2009. (Doc. 76, 77).

The summary judgment motions are now ripe for this Court's review. Because summary judgment will be entered in favor of Spurlock on both counts, the motions relating to the experts will be denied as moot.

## II.    **Jurisdiction and Legal Standard**

### A.    **Jurisdiction**

This Court has jurisdiction over the copyright infringement claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a) ("The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to . . . copyrights . . . ."). This Court has

supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367.

**B.**     **Legal Standard**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is

"genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving

party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is

"material" if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility for informing

the district court of the basis for its motion and identifying those portions of the record that it

believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett,

477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular

issue at trial, the moving party's initial burden can be met simply by "pointing out to the district

court that there is an absence of evidence to support the non-moving party's case." Id. at 325.

After the moving party has met its initial burden, the adverse party's response must, "by

affidavits or as otherwise provided in this rule [ ] set out specific facts showing a genuine issue

for trial." Fed. R. Civ. P. 56(e). Summary judgment is appropriate if the non-moving party fails

to rebut by making a factual showing "sufficient to establish the existence of an element essential

to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477

U.S. at 322. Under Rule 56, the Court must view the evidence presented on the motion in the

light most favorable to the opposing party. Anderson, 477 U.S. at 255.

## III.   Copyright Infringement Claims

The first count of Plaintiffs' Amended Complaint consists of the 24 claims of copyright infringement. "To establish a claim of copyright infringement, a plaintiff must establish: (1) ownership of a valid copyright; and (2) unauthorized copying of original elements of the plaintiff's work." Kay Berry, Inc. v. Taylor Gifts, Inc., 421 F.3d 199, 203 (3d Cir. 2005) (quoting Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc., 307 F.3d 197, 206 (3d Cir. 2002)).

### A.   Ownership

#### 1.   Ownership of the Gogos Artwork

The primary defense in this case offered by Spurlock is, assuming that Plaintiffs have established a prima facie case that the Gogos Book infringes Plaintiffs' magazine copyrights, the illustrations in the Gogos Book are entitled to the defense of fair use. However, as Spurlock notes in his response to Plaintiffs' Motion for Partial Summary Judgment, Plaintiffs raised a novel claim of ownership to the underlying Gogos artwork in their Motion, that was not initially the basis of their copyright claims in the Amended Complaint. Presumably, this assertion is due to the fact that, as discussed above, many of the images used for the Gogos book were not actually copies of the covers of the copyrighted works, but were instead copies of the Gogos artwork that was used for the covers. Though Plaintiffs make this assertion in their Motion for Partial Summary Judgment, the material facts at issue are vigorously disputed.[10]

---

[10] In support of their argument that they own the rights to the artwork, Plaintiffs rely on 17 U.S.C. § 3 as it existed under the 1909 Copyright Act, when it stated that "[t]he copyright provided by this Act shall protect all the copyrightable component parts of the work copyrighted, and all matter therein in which copyright is already subsisting, but without extending the duration or scope of such copyright. The copyright upon composite works or periodicals shall give to the

To what extent Plaintiffs can claim ownership over the artwork produced by Gogos for the covers implicates the "work-made-for-hire" doctrine. Both the test to determine what works are included and the legal ramifications of work-for-hire status depend on whether the work was prepared prior to the effective date of the 1976 Copyright Act—January 1, 1978. See 1 M. Nimmer & D. Nimmer, Nimmer on Copyright § 5.03[B][2][c], at 5-56.1 (2009) (hereinafter Nimmer on Copyright). The parties agree that each of the works at issue was created prior to that date, and the 1909 Copyright Act therefore controls. See Twentieth Century Fox Film Corp. v. Entm't Distrib., 429 F.3d 869, 876 (9th Cir. 2005).

First, the parties initially dispute whether the artwork is entitled to work-for-hire status. The Second Circuit has held that artwork is a work for hire "[w]hen one person engages another, whether as employee or as an independent contractor, to produce a work of an artistic nature," which thereby creates a presumption "that the mutual intent of the parties is that the title to the copyright shall be in the person at whose instance and expense the work is done." Playboy Enters., Inc. v. Dumas, 53 F.3d 549, 554 (2d Cir. 1995) (quoting Lin-Brook Builders Hardware v. Gertler, 352 F.2d 298, 300 (9th Cir. 1965)). Whether a work was created at the "instance and expense" of an employer has apparently become the primary test of work-for-hire status. Id. The test is also satisfied, and work-for-hire status established, "when the 'motivating factor in producing the work was the employer who induced the creation.'" Id. (quoting Siegel v. Nat'l

---

proprietor thereof all the rights in respect thereto which he would have if each part were individually copyrighted under this Act." Plaintiffs argue that, by virtue of this statute, the fact that the artwork was used in the magazines, which were later copyrighted, gives them presumptive ownership over the artwork as well. Plaintiffs have not offered any caselaw to support such an argument. And as discussed below, the relevant facts concerning this ownership are in serious dispute.

Periodical Publ'ns, Inc., 508 F.2d 909, 914 (2d Cir. 1974)). An important factor in this inquiry is whether the employer has the right to "direct and supervise the manner in which the writer performs his work." Id. (quoting Picture Music, Inc. v. Bourne, Inc., 457 F.2d 1213, 1216 (2d Cir. 1972)).

The parties dispute whether Gogos created the artwork at the "instance and expense" of Warren/Warren I. In a declaration provided to the Court, James Warren recalls how the commission was initiated and indicates that he exhibited almost total control over the details of Gogos's work. (Warren Decl. ¶ 5).[11] Spurlock in response argues that these statements are legal conclusions, and offers the sworn factual testimony of Jeffrey Rovin (though he is also offered as an expert), who was involved in much of the activities at issue as an employee of Warren I. Rovin stated that for some of the covers, Gogos chose his own picture to use for the artwork, and even where Warren chose it, Warren had virtually no input into the details of Gogos's painting. (Rovin Rep. ¶¶ 41-45).[12]

––––––––––––––

[11] "The cover paintings that were used as part of and incorporated into the covers of the above-identified magazines and comics, were conceived and created at the instance and expense of Publishing and were works for hire for the benefit of Publishing. These cover paintings were conceived by either me or by someone under my direct supervision and control. Once conceived, either I or someone under my direct supervision and control offered the assignment to Basil Gogos, a freelance artist, to produce these paintings for Publishing. I generally would meet with Mr. Gogos at Publishing's offices and provide Mr. Gogos with specific instructions as to content and appearance of the proposed cover paintings. In this respect, I would provide Mr. Gogos with sketches or photographs of what I wanted Mr. Gogos to render. . . . After approving of the cover painting—of which I had final say . . . ." (Warren Decl. ¶ 5).

[12] "There were two ways by which Mr. Gogos created covers for Famous Monsters. Either he was given a black-and-white still photograph to recreate in color, typically illustrating an article in the magazine, which he did on his own, outside the office; or else he found an image and rendered a painting, which he brought to the office." (Rovin Rep. ¶ 41). Rovin then provides several examples of covers where Gogos selected a picture or photo that contained flaws, which was exactly reproduced in the artwork since Warren and Rovin exerted no control

-14-

Beyond the significant factual disputes that exist as to whether the Gogos artwork is entitled to work-for-hire status, there are also significant disputes of fact concerning what legal rights each party is entitled to if the artwork was a work-for-hire. The parties agree that the 1909 Act applies, and it provides that, for purposes of copyright, "the word 'author' shall include an employer in the case of works made for hire." Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 743-44 (1989) (quoting 17 U.S.C. § 26 (1976 ed.)). However, the statute does not define the term "employer" and does not explicitly provide an assignment of rights for commissioned works. Id. at 744. In addressing the issue without the benefit of any statutory guidance, courts generally presumed that, for purposes of commissioned works, "the commissioned party had impliedly agreed to convey the copyright, along with the work itself, to the hiring party." Id. Beyond this initial presumption, "[w]hether copyright initially vested in the independent contractor preparing the work on commission or in the commissioning party always turned on the intention of the parties, where that intention could be ascertained." 1 Nimmer on Copyright, § 5.03[B][2][e], at 5-56.1 (citing, inter alia, Brattleboro Publ'g Co. v. Winmill Publ'g Corp., 369 F.2d 565 (2d Cir. 1966)). However, "[t]he burden of proof is on the independent contractor to demonstrate by a preponderance of the evidence that such a contrary agreement was reached." Playboy Enters., 53 F.3d at 554-55.

With no detailed agreement establishing the intent of the parties, each side again presents their own version of events. Warren provides in his declaration that he and Gogos had an

_____

over the artistic process. (Id.). "Mr. Warren never, in my experience, gave instructions to Mr. Gogos on the pallette or cropping of the original image. Only when the painting was delivered did Mr. Warren become involved, often using a tissue overlay to indicate to the art director where he wanted the cover blurbs to go, and what color he wanted for the lettering and the Famous Monsters logo." (Rovin Rep. ¶ 43).

-15-

agreement that Warren would gain all rights to the work, and at some point the check that

Warren wrote to Gogos for payment contained a mark that indicated such an intent. (Warren

Decl. ¶ 5).[13]  On the other hand, Spurlock offers several pieces of evidence in response to suggest

that the parties never did intend such a transfer of rights.  First, Spurlock offers the declaration of

Basil Gogos himself, who states that he and Warren "had an express gentleman's agreement that

any art I created would be used once only on the cover of one of his magazines and all of [his] art

would be returned."  (Def. Opp. to Pls.' Mot. Summ. J. Ex. A).[14]

     Next, Spurlock offers several pieces of evidence regarding the standard practice for

ownership of rights to artwork commissioned by Warren.  See 1 Nimmer on Copyright, §

5.03[D], at 5-56.12 ("[A] custom or usage whereby certain rights are reserved to the employee, if

such custom or usage was known to the parties, or might be presumed to have been so known,

would become an implied in fact term of the contract of employment.").  First, Rovin states that,

"[i]f there were [sic] a general policy regarding cover art, it was this:  artists tended to allow

Warren [] to print, and reprint, the artwork as a cover without obtaining permission or making

additional payment(s); but artists were free to sell the original art or use it in career compendia or

_____

[13] "Although I am not certain of exactly when Publishing began the practice or of its exact
wording, the checks provided to Mr. Gogos contained a legend which stated that, by endorsement
of the check, Mr. Gogos acknowledged payment for services rendered on a work for hire basis in
connection with the commissioned painting and confirmed that Publishing owned all right, title
and interest in and to the painting (which I called 'world rights')."  (Warren Decl. ¶ 5).

[14] Plaintiffs later rebut this statement with a quote from an interview with Gogos, where
he stated that "[b]ehind each check were rules about how the covers belonged to Jim [Warren]
totally! . . . It was a work for hire.  I signed away all these covers because I needed a job."
(Def.'s Mot. Summ. J. Ex. 65 at 87); (Daniel Decl. at ¶ 8, Ex. 1).

genre overviews." (Rovin Rep. ¶ 27).[15]  Spurlock then offers the testimony of several other cover artists, who testified that they retained the rights to their artwork and only sold Warren a one-time license for the magazine covers,[16] thus suggesting that this was the standard practice of Warren/Warren I at the time.

These disagreements preclude coming to a conclusion on the issue of ownership in the artwork, and show that there is a genuine issue of material fact as to whether Plaintiffs have ownership rights to the artwork that Spurlock used in the book, which are the basis of the majority of Plaintiffs' claims.  This in itself would be sufficient to defeat Plaintiffs' Motion for Partial Summary Judgment on these pieces of art.  However, as will be discussed below, this issue is mooted by Spurlock's reliance on the fair use defense; though, to the extent that it is relevant to the fair use analysis, the unsettled ownership of the artwork may bear on Plaintiffs' claim that Spurlock engaged in "bad faith" by utilizing the art in the Gogos Book without paying a licensing fee.

### 2.   Ownership of the Magazine Copyrights

In addition, Spurlock claims that when Warren I filed for bankruptcy, all assets of Warren I, including the copyrights and trademarks at issue in this case, were sold to Harris Publications, Inc. ("Harris").  Warren, however, claims that after all the company's debts were satisfied, this intellectual property was transferred to him, as the sole shareholder of Warren I.  In 1984, Harris

---

[15] Plaintiffs rebut this statement, to a certain extent, in their brief on several grounds. (Pl.'s Reply Supp. Pl.'s Mot. Summ. J. at 16 n.51).

[16] (Ken Kelly Decl., Def.'s Resp. Pl.'s Mot. Summ. J. Ex. B, at ¶¶ 3-5); (Maelo Cintron Decl., Def.'s Resp. Pl.'s Mot. Summ. J. Ex. C, at ¶¶ 3-4); (Harry Roland Decl., Def.'s Resp. Pl.'s Mot. Summ. J. Ex. D, at ¶¶ 3, 5, 6); (Don Maitz Decl., Def.'s Resp. Pl.'s Mot. Summ. J. Ex. E, at ¶¶ 3-4).

disputed Warren's ownership and laid claim to the literary properties of Warren I. In 2000, a settlement was reached with Harris whereby Warren and Warren II, which was incorporated by Warren in 1998, took undisputed ownership to all of the relevant literary properties. Plaintiffs assert that since that time, Warren and Warren II have been the undisputed owners of the <u>Famous Monsters</u> copyrights involved in this suit. Spurlock nonetheless contends that the copyrights were issued to Warren I and that Plaintiffs therefore do not have standing to bring this suit.

### 3.   Ownership of Eerie and Creepy Copyrights

Additionally, there is a dispute between the parties over who owns the copyrights to the <u>Creepy</u> and <u>Eerie</u> comics. In February 2007, Warren II transferred all rights to <u>Creepy</u> and <u>Eerie</u> over to a third party, New Comic Company LLC. Spurlock contends that the Purchase Agreement transferred the right to sue for any infringement of these copyrights. Plaintiffs, however, argue that the right to sue for infringement that occurred prior to the date of the contract remained with Plaintiffs.

In any event, despite these disputes over ownership, Spurlock's counsel conceded at oral argument that, for purposes of the motions for summary judgment, Plaintiffs have satisfied the elements of ownership and copying. <u>See</u> (Oral Arg. 4:14-5:24) (Def. Counsel: "My summary judgment would presume that he owns them, Your Honor. . . . Judge: "And the same thing for copying? You concede that as well?" Def. Counsel: "For purposes – yes, absolutely.").

Spurlock's Motion for Summary Judgment instead focuses solely on the affirmative defense of fair use. <u>See</u> (Oral Arg. 5:6-9) (Def. Counsel: "My summary judgment would presume that he owns them, Your Honor. My summary judgment is . . . based upon fair use."). Nonetheless, these disputes over ownership may have some bearing on whether Spurlock is

entitled to the protection of fair use.

## B.   Fair Use Defense

The defense of fair use for copyright claims has a long and deep history. "From the infancy of copyright protection, some opportunity for fair use of copyrighted materials has been thought necessary to fulfill copyright's very purpose, '[t]o promote the Progress of Science and useful Arts . . . .'" Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 575 (1994) (quoting U.S. Const. art. I, § 8). While the defense was not initially codified in 1790, when Congress first established the copyright infringement cause of action, "the doctrine was recognized by the American courts nonetheless." Id. at 576. The affirmative defense of fair use was finally codified by the 1976 Copyright Act. Id.

The textual basis of the defense now provides that:

> the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include--
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.
> The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

17 U.S.C. § 107. Courts do not consider fair use "with bright-line rules, for the statute, like the

doctrine it recognizes, calls for case-by-case analysis." Campbell, 510 U.S. at 577. The four

listed factors are not to be considered in isolation and "do not represent a score card that

promises victory to the winner of the majority." Video Pipeline, Inc. v. Buena Vista Home

Entm't, Inc., 342 F.3d 191, 198 (3d Cir. 2003) (quoting Pierre N. Leval, Toward a Fair Use

Standard, 103 Harv. L. Rev. 1105, 1110 (1990)). Instead, the factors are "to be explored, and the

results weighed together, in light of the purposes of copyright." Id. (quoting Campbell, 510 U.S.

at 578); see also Leval, supra, at 1110-11 ("[The fair use factors] direct courts to examine the

issue from every pertinent corner and to ask in each case whether, and how powerfully, a finding

of fair use would serve or disserve the objectives of the copyright."). "This focus on copyright's

purpose makes relevant a comparison of the copy with the original: where the copier uses none

of his own creative activity to transform the original work, holding the fair use doctrine

inapplicable will not likely interfere with copyright's goal of encouraging creativity." Video

Pipeline, 342 F.3d at 198. "[T]he alleged infringer bears the burden of proof" on the issue since

fair use is an affirmative defense. Id. at 197.

## 1.    Fair Use on Summary Judgment

The threshold issue at this stage of proceedings, in considering Spurlock's reliance on fair

use, is to what extent district courts may consider such a defense on summary judgment. While

the Third Circuit has not yet specifically addressed this issue, the Second and the Ninth Circuits

have. Both Circuits have generally recognized that, "[a]lthough the issue of fair use is a mixed

question of law and fact, the court may resolve issues of fair use at the summary judgment stage

where there are no genuine issues of material fact as to such issues." Bill Graham Archives v.

Dorling Kindersley Ltd., 448 F.3d 605, 608 (2d Cir. 2006); Kelly v. Arriba Soft Corp., 336 F.3d

811, 817 (9th Cir. 2003) ("We also review the court's finding of fair use, which is a mixed

question of law and fact, [de novo]."); see also Harper & Row, Publishers, Inc. v. Nation Enters.,

471 U.S. 539, 560 (1985) ("Fair use is a mixed question of law and fact.").[17]

### 2.    Factor 1—Purpose and Character

The first factor requires the Court to consider "the purpose and character of the use,

including whether such use is of a commercial nature or is for nonprofit educational purposes."

17 U.S.C. § 107(1).  The first factor is intended to determine

> whether the new work "merely supersede[s] the objects" of the
> original creation, or instead adds something new, with a further
> purpose or different character, altering the first with new
> expression, meaning, or message; it asks, in other words, whether
> and to what extent the new work is "transformative."  Although
> such transformative use is not absolutely necessary for a finding of
> fair use, the goal of copyright, to promote science and the arts, is
> generally furthered by the creation of transformative works. . . .
> [T]he more transformative the new work, the less will be the
> significance of other factors, like commercialism, that may weigh
> against a finding of fair use.

Campbell, 510 U.S. at 579 (internal citations omitted).

Two other considerations in the context of the first fair use factor bear mentioning.  First,

---

[17] The cases sending the fair use issue to trial are remarkably few.  See Ass'n of Am.
Med. Colleges v. Cuomo, 928 F.2d 519, 525-26 (2d Cir. 1991) (reversing district court's grant of
summary judgment after holding that genuine issues of material fact existed as to fourth fair use
factor); Byrne v. British Broad. Corp., 132 F. Supp. 2d 229, 236 (S.D.N.Y. 2001) (Stein, J.)
(denying motion for summary judgment after holding that there were genuine issues of material
fact as to first fair use factor).  The cases show that although a district court may of course not
decide questions of fact on summary judgment, the district judge can, if the underlying facts are
not in dispute, apply those facts to the law and come to a conclusion on fair use.  In other words,
contrary to many other types of cases in which issues of motive and intent may be important
(e.g., employment discrimination cases, cf. Hare v. Potter, 220 Fed. Appx. 120, 129-30 (3d Cir.
2007) (reversing grant of summary judgment where employee created genuine issue of fact as to
employer's possibly retaliatory motive in not assigning plaintiff to a special program), the court,
rather than the jury, applies the facts to the governing law, at least as to the fair use defense.

much has been made about what impact an infringing work's "commercial" purpose, as opposed to "nonprofit" purpose, has on this first factor.  While some language in an earlier decision of the Supreme Court had suggested that an infringing work's commercial purpose was dispositive of the first factor, see Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 451 (1984) ("[E]very commercial use of copyrighted material is presumptively . . . unfair . . . ."), more recent decisions have provided some clarification.

> [T]he commercial or nonprofit educational purpose of a work is
> only one element of the first factor enquiry . . . . [T]he mere fact
> that a use is educational and not for profit does not insulate it from
> a finding of infringement, any more than the commercial character
> of a use bars a finding of fairness.

Campbell, 510 U.S. at 584.  Instead, "the 'fact that a publication was commercial as opposed to nonprofit is a separate factor that tends to weigh against a finding of fair use.'"  Id. at 585 (quoting Harper & Row, 471 U.S. at 562); Video Pipeline, 342 F.3d at 198 ("If a new work is used commercially rather than for a nonprofit purpose, its use will less likely qualify as fair.").  "The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price."  Harper & Row, 471 U.S. at 562.

Second, much has also been made of a defendant's "bad faith" in regards to the first factor.  While the Supreme Court in Harper & Row stated that good faith and fair dealing were required for a finding of fair use, 471 U.S. at 562, the Court's later decision in Campbell appeared to suggest, though not directly holding, that this was no longer true, 510 U.S. at 585 n.18; see also Leval, supra, at 1126 ("No justification exists for adding a morality test.").  In any event, the important lesson on bad faith to be taken from Campbell is that a defendant's "request

-22-

for permission to use the original" and "being denied permission to use a work do[] not weigh

against a finding of fair use." Campbell, 510 U.S. at 585 n.18. Where the defendant requested

permission, "the offer may simply have been made in a good-faith effort to avoid [] litigation."

Id.

### a.  **Transformative Nature**

One of the leading and most incisive explanations of the concept of transformative use

comes from Judge Leval's seminal law review article:

> The use must be productive and must employ the quoted matter in
> a different manner or for a different purpose from the original. A
> quotation of copyrighted material that merely repackages or
> republishes the original is unlikely to pass the test; in Justice
> Story's words, it would merely "supersede the objects" of the
> original. If, on the other hand, the secondary use adds value to the
> original—if the quoted matter is used as raw material, transformed
> in the creation of new information, new aesthetics, new insights
> and understandings—this is the very type of activity that the fair
> use doctrine intends to protect for the enrichment of society.

Leval, supra, at 1111. He later elaborates:

> Quoting is not necessarily stealing. Quotation can be vital to the
> fulfillment of the public-enriching goals of copyright law. The first
> fair use factor calls for a careful evaluation whether the particular
> quotation is of the transformative type that advances knowledge
> and the progress of the arts or whether it merely repackages, free
> riding on another's creations. . . . Factor One is the soul of fair use.

Id. at 1116.[18]

Spurlock contends that his use of Plaintiffs' work in a biography and artist's retrospective

"is a work of scholarship, comment, and research, and is precisely the type of work that the Fair

---

[18] "Quoting" is effectively what Spurlock has done here, but with illustrations, rather than
words.

Use Doctrine is intended to protect." He argues that, while the original purpose of the covers was to sell magazines, his use of the covers is transformative since it is biographical in nature and illustrates the "evolution of an artist." Spurlock further notes that, of the 24 covers at issue, 14 are displayed without any <u>Famous Monsters</u> text obstructing the artwork, and any claims of infringement, even if legally valid, are misguided because the copying is only of the Gogos artwork without any reference to Plaintiffs' magazine.

Plaintiffs respond by arguing that the Gogos Book attempts to present the art in a pure form. Although some of the images appear without the <u>Famous Monsters</u> headings and some are reduced in size, many are reproduced in virtually the same size as the original magazine covers (8.5" x 11"), are the main "focal points" of each page, and are reproduced for the appreciation of the artistic accomplishment—the same purpose for which the covers were originally used. Additionally, Plaintiffs note that many of the reproductions are unaccompanied by any commentary or criticism and that "[t]he degree of copying and the manner in which the reproductions are prominently displayed, combined with the absence of commentary, is [sic] inconsistent with alleged 'scholarship.'"

There are some characteristics regarding Spurlock's use that do not support his claim of fair use. For instance, the fact that Plaintiffs' work is in a periodical magazine format, as compared to Spurlock's work composed of a single issue book, is relevant but not determinative. See <u>Blanch v. Koons</u>, 467 F.3d 244, 252 (2d Cir. 2006) ("We have declined to find a transformative use when the defendant has done no more than find a new way to exploit the creative virtues of the original work."). And, Plaintiffs are correct in noting that the covers and images are reproduced with little or no modification.

-24-

But the Gogos Book presents these images for an entirely different purpose. The book takes the reader through the history of Gogos's work and his career. It discusses Gogos's time creating art for the covers of James Warren's magazines, chronicles his work that portrayed the "Old West," then moves on to his art in "men's magazines." The book also provides commentary from many respected individuals in the movie monster industry who attest to the quality of the work and his lasting legacy. The Gogos Book is a retrospective and an illustrated biography of an artist who was, and remains, important to movie monster enthusiasts. While the subject matter of his artwork may be unconventional, Basil Gogos created significant and highly detailed art, often used as illustrations for magazines, movie posters, and advertisements. The Gogos Book utilizes the magazine covers as several examples of those many different productions in order to pay homage to his artistic accomplishments. Spurlock's book is focused on the art of one person, Gogos.

The Warren magazines, on the other hand, do no such thing. Each of the magazine issues is devoted towards discussing developments in the world of movie monsters, interviewing actors in the genre (e.g., Béla Lugosi), and advertising various movie monster-related paraphernalia. With the nature of the magazines in mind, the covers were not used for the purpose of paying homage to Basil Gogos or to chronicle his career. Rather, these covers were utilized to help sell magazines, for the purpose of describing the latest in monster movies through an eye-catching display, and to convey to the reader or potential reader what topics the magazine discussed in that issue.

As a representative example, for issue number 59 of the Famous Monsters magazine (the focus of Plaintiffs' fifth claim of copyright infringement) Basil Gogos created a piece depicting

-25-

the portrait of a television character, Barnabas Collins, who was a vampire in the television show "Dark Shadows." In front of the artwork, the cover exclaims that the issue contains an article "All About Barnabas Collins!". (Def.'s Mot. Summ. J. Ex. 12). The article referred to, entitled "Who's A-Frid of the Big Bad Vampire," profiles Jonathan Frid, the actor who portrays Barnabas Collins, and discusses the television show. Importantly, the magazine does not use the artwork in order to portray Gogos's talents or chronicle his career. Instead, the artwork is used to promote the magazine's article discussing Barnabas Collins and the Dark Shadows show. The same can be said of each of the other magazine covers that are at issue in this litigation.

As Judge Leval explains, the first factor requires this Court to consider whether the infringing work "employ[s] the quoted matter in a different manner or for a different purpose from the original." Leval, supra, at 1111. This question is clearly answered in the affirmative. After reviewing the Gogos Book and the Warren magazines in detail and in their entirety, this Court finds that Spurlock's use of the Gogos art is transformative relative to the original purpose.

What is particularly pertinent to this Court's analysis and conclusion is that the Gogos Book is appropriately characterized as a biography or a career retrospective. As the Second Circuit's caselaw indicates, "biographies in general and critical biographies in particular, fit 'comfortably within' these statutory categories 'of uses illustrative of uses that can be fair.'" New Era Publ'ns Int'l, ApS v. Carol Publ'g Group, 904 F.2d 152, 156 (2d Cir. 1990) (quoting Salinger v. Random House, Inc., 811 F.2d 90, 96 (2d Cir. 1987), cert. denied, 484 U.S. 890). While acknowledging that these categories are not endowed with a presumptive entitlement to the defense, Harper & Row, 471 U.S. at 561 ("This listing was not intended to be exhaustive or to single out any particular use as presumptively a 'fair' use.") (internal citations omitted), this

-26-

Court's analysis is "guided by the examples" of § 107's preamble, Campbell, 510 U.S. at 578,

and the examples help illustrate the purpose of fair use and the types of works that meet its

requirements. That Spurlock's book fits "comfortably within" the statutory categories only

serves to reinforce this Court's conclusion that Spurlock's use was transformative.

### b.    **Analogous Cases**

In coming to its conclusion, this Court finds two cases particularly analogous. First, in

Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605 (2d Cir. 2006), the Second

Circuit determined that the defendant's coffee table book, which provided a "cultural history of

the Grateful Dead," was sufficiently transformative, relative to the original purpose of the

copyrighted images from Grateful Dead event posters and tickets, for several reasons. Id. at 608-

12. First, the court found that the defendant's book was essentially a

> biographical work documenting the 30-year history of the Grateful
> Dead. While there are no categories of presumptively fair use,
> courts have frequently afforded fair use protection to the use of
> copyrighted material in biographies, recognizing such works as
> forms of historic scholarship, criticism, and comment that require
> incorporation of original source material for optimum treatment of
> their subjects.

Id. at 609 (internal citations omitted). While the copyrighted works were artistic and "were

apparently widely distributed to generate public interest in the Grateful Dead and to convey

information to a large number of people about the band's forthcoming concerts," id., the

defendant "used each of [the] images as historical artifacts to document and represent the actual

occurrence of Grateful Dead concert events featured on [the book]'s timeline," id. The court also

stated that the defendant's claim that the use was transformative was "strengthened by the

manner in which [the defendant] displayed the images." Id. at 611. The copyrighted works were

-27-

reduced to sizes that were only large enough "to permit readers to recognize the historical significance of the posters" and were combined "with a prominent timeline, textual material, and original graphical artwork, to create a collage of text and images on each page of the book." Id.

Next, the court found that the copyrighted images were only "an inconsequential portion of [the defendant's book]," id., recognizing that "[t]he extent to which unlicensed material is used in the challenged work can be a factor in determining whether a biographer's use of original materials has been sufficiently transformative to constitute fair use," id. Because the defendant's book only contained the plaintiff's images on seven, out of 480, pages, and since the images were less than 1/20th the size of the originals at the most, this too supported the defendant. Finally, the court considered whether the "commercial purpose" inquiry worked against a finding of fair use for the defendant. The court concluded that it did not and stated that the defendant had "not used any of [the plaintiff]'s images in its commercial advertising or in any other way to promote the sale of the book." Id. at 612. With all these considerations in mind, the court held that the first fair use factor weighed in favor of the defendant.

In comparing Bill Graham to the facts at hand, the Second Circuit's analysis illustrates the differences between the Gogos Book and Plaintiffs' magazine covers that establish the transformative nature of the use. First, the difference in purpose, between how Plaintiffs used the magazine covers as compared to Spurlock, is almost identical to the difference described in Bill Graham. Plaintiffs' magazine covers had been used "to generate public interest" in the magazines and "to convey information" to passers-by of the magazine's content in that issue. Spurlock, on the other hand, used the covers "as historical artifacts to document and represent" the work product of an accomplished artist. Second, Spurlock's manner of reproduction is also

-28-

supportive of fair use. Many of the images were reduced in size, had the cover text and the magazine title logo removed, and were the subject of criticism and commentary adjacent to the art. Where the cover text was not removed, the images were reduced to only a fraction of their original size. As to Plaintiffs' argument that Spurlock could have reduced the larger images or changed all of them to black-and-white, such modifications would undermine the very heart of the publication, which is to chronicle the achievements of a renowned artist. Vivid colors are an important element in depicting monsters, particularly their faces. The proportion of images in the Gogos Book that were allegedly improperly used is also small (24 out of 160, or 15%).

Finally, there is little evidence to support Plaintiffs' claims that Spurlock's use was sufficiently commercial in nature to overcome the transformative purpose. Though Plaintiffs point out that Spurlock admits to making a profit from the book, "[t]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." Bill Graham, 448 F.3d at 612 (quoting Harper & Row, 471 U.S. at 562). The only arguments Plaintiffs make in support of this narrow argument is that: (a) the front flap states that art from Plaintiffs' magazines will be included; (b) one copyrighted cover is included on the back with four other magazine covers; and (c) the title is misleading (the same argument made for the unfair competition claim). The fact that the front flap, which contains information on the contents of the book, accurately informs readers that some of the Gogos images from Plaintiffs' magazines are included, cannot seriously be characterized as "exploitation." The placement of a cover on the back of the book with four other images not from Plaintiffs' magazines is relatively minor in nature, even if supportive of Plaintiffs' "commercialism"

-29-

argument. And, to the extent that Plaintiffs rely on the argument that the title is misleading,

Plaintiffs have not offered any caselaw to suggest that this would satisfy the "commercialism"

inquiry. In any event, to the extent that any of these relatively minor uses could be characterized

as "exploitation" of Plaintiffs' copyrighted works, the transformative nature of Spurlock's use is

more than sufficient to push the first factor in Spurlock's favor.

The second analogous case is Hofheinz v. A&E Television Networks, 146 F. Supp. 2d

442 (S.D.N.Y. 2001) (Sweet, J.). In Hofheinz, the claim for copyright infringement concerned an

A&E biography of an actor, Peter Graves. Id. at 443. As with most A&E biographies, the

60-minute television program contained clips from movies and television shows that Peter

Graves was involved in, and it also provided commentary from Graves, his family, and his

friends. Id. The biography contained a 20-second clip of one of Graves's movies, "It Conquered

the World," though the footage was actually derived from the theatrical trailer. Id. at 443-44. On

a motion for summary judgment, the court held that A&E's biography did amount to "fair use."

Id. at 449. As to the first fair use factor, the court stated that, while the A&E piece "may not be a

'scholarly' biography . . . the use made of this particular footage from 'It Conquered the World,'

to show the kind of motion picture roles Graves took when he first began his acting career and

what his perception of them was, served to enrich the biography through the actor's perspective

on his own work." Id. at 446. The court determined that the use was "transformative" since it

"enabl[ed] the viewer to understand the actor's modest beginnings in the film business." Id. at

446-47.

The facts of the case at hand are very similar to those in Hofheinz. Though the Gogos

Book is not "scholarly," it is certainly a biography, or at least a career retrospective. And for that

reason, applying Judge Sweet's language to these facts: Plaintiffs' use of the copyrighted magazines, "to show the kind of [work Gogos] took when he first began his [] career and what his perception of [the work] was, served to enrich the biography through the [artist]'s perspective on his own work." Id. at 446. Judge Sweet came to his conclusion that fair use existed in Hofheinz even where the A&E biography could be characterized as "commercial in nature" in the same ways as the Gogos Book. Nonetheless, the fact that the copyrighted clip was meant to put the artist's career in context and communicate to the audience the type of work that Peter Graves took part in was sufficient to make the biography's use "transformative." All the facts deemed relevant to establish fair use in Hofheinz could be said of the Gogos Book, which also provides a history of the artist and places his work into some context.

### c. **Bad Faith**

The final issue for the first factor is whether Spurlock engaged in bad faith, which could have some impact on the first factor analysis.[19] Plaintiffs argue that Spurlock did act in bad faith since he allegedly knew that Plaintiffs owned the copyrights, negotiated for a licensing fee, but then went ahead with publication when the parties could not come to an agreement. Defendants also raise the earlier argument that Spurlock engaged in bad faith by trying to make the book title similar to the Famous Monsters magazine. (Spurlock Dep. 1/28/09 213:14-215:8).

As to Plaintiffs' first suggestion, that Spurlock's failed attempt at negotiating a licensing fee amounts to bad faith, such a claim has been considered and explicitly rejected by the

---

[19] This Court acknowledges the cloud that currently hangs over the vitality of the bad faith inquiry. See Campbell, 510 U.S. at 558 n.18 (suggesting, though not directly holding, that bad faith may not be an appropriate part of the fair use analysis); Leval, supra, at 1126 ("No justification exists for adding a morality test.").

Supreme Court. In Campbell, the plaintiff also made the argument that the defendant's "request for permission to use the original should be weighed against a finding of fair use." 510 U.S. at 585 n.18. In dismissing the argument, the court stated that "the offer may simply have been made in a good-faith effort to avoid this litigation. . . . Thus, being denied permission to use a work does not weigh against a finding of fair use." Id.

In addition, Plaintiffs' first argument—essentially, that Spurlock knew Plaintiffs owned the copyrights but went ahead anyway—is difficult to accept in light of the Court's earlier discussion concerning the ownership of the artwork. As noted above, most of the images used by Spurlock that are at issue here were not copies of the magazine covers, but were copies of the art used as the background of the magazine covers. For these images, it is by no means clear, even after discovery, who owns the rights to these images. In light of this, it would be difficult to fault Spurlock and charge him with "bad faith" for using the images. If this Court were to come to such a conclusion, claims of fair use would be undermined for an overwhelming number of defendants in copyright cases—for defendants that were aware that the plaintiffs had ownership over the works, and for defendants where ownership was dubious. Because this does not comport with the rationale behind the bad faith inquiry, this Court will not accept Plaintiffs' argument.

Finally, as to Plaintiffs' claim that the misleading nature of the title is supportive of bad faith, Plaintiffs have again failed to offer any caselaw that would support such a theory.

In any event, even if bad faith has some role in the first factor analysis, Spurlock has shown that his use of the copyrighted works is sufficiently transformative relative to the original use by Plaintiffs. Therefore, in light of all of the evidence on the record and all of the first factor

-32-

considerations, this Court determines that the first fair use factor weighs heavily in favor of Spurlock.

### 3.  Factor 2—Nature of the Plaintiff's Work

The second factor requires this Court to consider "the nature of the copyrighted work." 17 U.S.C. § 107(2).  "This factor calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied."  Campbell, 510 U.S. at 586.  Works that are fictional or creative are "closer to this core" than those works that are primarily factual.  Video Pipeline, 342 F.3d at 200.  In his brief, Spurlock concedes that the copyrighted magazine covers fall within the core of the Copyright Act's protective purposes since they are creative expressions.

However, the fact that the copyrighted magazines are out-of-print has some bearing on the second fair use factor.  In Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters., Int'l, 533 F.3d 1287 (11th Cir. 2008), the Eleventh Circuit considered the impact that out-of-print status has on the second factor analysis:

> [O]ut-of-print works are generally accorded less copyright protection.  The relevant fact is not simply that the work is unavailable for purchase through normal channels. . . . Rather, that fair use is more likely to apply in the standard scenario of an out-of-print work reflects in large part the assumption that no market harm to the owner will come of the use, as presumably it was lack of demand for the work that led to its demise. . . . Neither the personal nor the property interests of the author are thus strongly implicated with respect to the typical out-of-print work.

Id. at 1313.  However, the court noted that the copyrighted work at issue in that case was out-of-print due to the author's choice to withdraw the work from the market, rather than from a lack of

-33-

demand. Id. This difference somewhat complicates the analysis, which then turns on motivations for removal from the market, pricing strategies, and whether a market exists for the work. Id. at 1313-14.

In the case at hand, there is some dispute between the parties as to whether Famous Monsters and the other magazines became out-of-print due to Warren's health or because of declining interest in the genre. However, this debate ignores the proper focus—the cause for the out-of-print status as to each copyrighted work, not the cause for the end of Plaintiffs' magazines. Each issue of the magazines became out-of-print simply because that is the natural and inevitable fate for magazines and periodicals, such as the magazines formerly owned by Plaintiffs. For example, as to the focus of the first claim of copyright infringement, Warren did not end publication of Famous Monsters #23 due to Warren's health, but simply because the company moved on to the next issue of Famous Monsters. A fair argument could be made that this cuts in favor of Spurlock's argument that each issue went out-of-print due to lack of demand, even if that is the nature of the market.

In any event, as Spurlock notes, courts have recognized that this second factor is of limited usefulness where the defendant's work is "transformative" in nature. See Bill Graham, 448 F.3d at 612 ("We recognize, however, that the second factor may be of limited usefulness where the creative work of art is being used for a transformative purpose." (citing Campbell, 510 U.S. at 586)). That statement is true in this case. This Court finds that this factor weighs slightly in favor of Plaintiffs, but it is of limited relevance because of the prior finding that Spurlock's work is transformative.

-34-

### 4.    Factor 3—Amount and Substantiality Used

For the third factor, this Court must next consider "the amount and substantiality of the

portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). In other

words, this factor inquires whether "the quantity and value of the materials used" by the

defendant "are reasonable in relation to the purpose of the copying." Campbell, 510 U.S. at 586.

"[T]his factor calls for thought not only about the quantity of the materials used, but about their

quality and importance, too." Id. at 587. In addition, consideration of the nature of the infringing

work is relevant, since "the extent of permissible copying varies with the purpose and character

of the use." Id. at 586-87. In general, though, "a work composed primarily of an original,

particularly its heart, with little added or changed, is more likely to be a merely superseding use,

fulfilling demand for the original." Id. at 587-88.

As to the quantitative analysis, Spurlock next argues that the magazine covers that he

copied make up only 1-1.5% of each of Plaintiffs' copyrighted works, which is each issue of the

magazines. In response, Plaintiffs rely on Schiffer Publ'g, Ltd. v. Chronicle Books, LLC, 2004

WL 2583817 (E.D. Pa. Nov. 12, 2004) (Schiller, J.). In Schiffer, the court considered the

legitimacy of the fair use defense for a defendant that copied individual photographs from 13 of

the plaintiff's copyrighted books; the books were the copyrighted products, not the individual

photographs within the books. Id. at *1-4. In considering the third fair use factor, the court

rejected the argument that Spurlock makes here, stating that such an argument "misapprehends

the proper frame of reference. Each photograph is an individually copyrighted work, and it is the

amount used of each one that should be analyzed." Id. at *12. Plaintiffs argue that the covers,

like the photographs in Schiffer, are individually copyrighted works, and the copying should be

-35-

measured in terms of each magazine cover.

Plaintiffs' argument, however, is contrary to binding precedent. In conducting the quantitative portion of the third factor analysis, both the Supreme Court and the Third Circuit have considered the portion of the copyrighted work utilized by the infringing work relative to the copyrighted work as a whole. See Campbell, 510 U.S. at 586-90 (comparing copyrighted song in its entirety to the defendant's song); Harper & Row, 471 U.S. at 564-65 (conducting quantitative analysis of third factor by considering what portion of the entire copyrighted manuscript the defendant's infringing work used); Video Pipeline, 342 F.3d at 201 (conducting quantitative analysis of the third factor by considering what portion of the entire copyrighted movie the defendant's infringing previews used). None of the Supreme Court or Third Circuit cases support Plaintiffs' argument that the copyrighted work can be cut or spliced to maximize the percentage used and to support Plaintiffs' response to the fair use defense. Indeed, the factor itself dictates otherwise. See 17 U.S.C. § 107(3) ("the amount and substantiality of the portion used in relation to the copyrighted work as a whole." (emphasis added)).

Spurlock is therefore correct when he asserts that, since each of the magazines ranged from 68 to 100 pages, (Def's Mot. Summ. J. Ex. 8-27, 38, 28, 39-40), the portion taken was from 1% to 1.5% of each of the magazines. This Court finds, as the Third Circuit did in Video Pipeline, that such a portion taken "is quite small." 342 F.3d at 201 (finding that 1.7% to 2.2% copying to be quantitatively small). Indeed, Plaintiffs could not reasonably be expected to take anything less; the entire point of using these covers is to portray Gogos's work. Therefore, this percentage is also quantitatively "reasonable in relation to the purpose of the copying." Campbell, 510 U.S. at 586.

-36-

Nonetheless, Plaintiffs argue, and Spurlock disputes, that the magazine covers were qualitatively a significant portion of the magazines and were at "the heart" of the magazine's content.  Plaintiffs contend that the covers were a "central and valuable part of Plaintiffs' works." (Warren Decl. ¶ 9); (Gogos Book, Front Flap) ("Issues of [Famous Monsters] practically leapt off the newsstand due in no small way to their striking cover paintings by Basil Gogos.").  Spurlock, on the other hand, argues that the "heart" of the magazines was not the covers, but was instead the content of the magazines that kept its readers up-to-date on movie monster gossip.

Upon a review of the magazines and the other evidence in the record, this Court finds that Spurlock did not appropriate the "heart" of the copyrighted works.  As discussed above in the first fair use factor analysis, each magazine was devoted to updating its readers on recent developments in the movie monster industry and providing in-depth interviews with leading figures in the world of movie monsters.  The magazines did not include a collage of movie monster art or a portfolio of movie monster artists.  Indeed, no issue highlights the work of a specific artist.  The covers were not the qualitative "heart" of the magazines, but were instead used to catch the eye of potential readers at the newsstand and advertise the content of the magazine.  The quality and importance of these covers as used in the original magazines are relatively minor.

Plaintiffs also argue that Spurlock has not offered any good reason why he could not have changed the covers to be different, e.g., black-and-white or smaller size.  However, making these changes would directly thwart one of the key purposes of the book—to showcase the detailed work of Basil Gogos.  Though such a burdensome change may be necessary in other cases where the defendant takes both a quantitatively large portion and the "heart" of the copyrighted work,

-37-

Spurlock did neither.

In light of the above analysis, this Court finds that the third fair use factor weighs in favor of Spurlock.

### 5.    Factor 4—Effect on Potential Market Value

Finally, the fourth factor requires this Court to consider "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor includes

> not only the extent of market harm caused by the particular actions
> of the alleged infringer, but also whether unrestricted and
> widespread conduct of the sort engaged in by the defendant . . .
> would result in a substantially adverse impact on the potential
> market for the original.  The enquiry must take account not only of
> harm to the original but also of harm to the market for derivative
> works.

Campbell, 510 U.S. at 590 (internal citations and quotations omitted). The market for derivative works "includes only those that creators of original works would in general develop or license others to develop." Id. at 592. The extent to which the market is harmed is a "matter of degree, and the importance of this factor will vary, not only with the amount of harm, but also with the relative strength of the showing on the other factors." Id. at 591 n.21. As with the three other factors, the defendant has the burden to offer favorable evidence on market effect. Id. at 590.

Plaintiffs' arguments on this factor focus solely on the market for derivative works of the magazines and, in particular, a coffee-table book that Warren has considered publishing. Warren asserts that he has, and has had for some time, an interest in using the Famous Monsters magazines and the magazine covers for a coffee-table book that would chronicle the history and success of the Famous Monsters of Filmland magazines. Spurlock, on the other hand, argues that Warren's interest has been just that– only interest—and that, despite his self-professed intent to

-38-

create this hook, Warren has taken no significant steps to do so.

Upon a review of the evidence on the record, this Court agrees with Spurlock that Warren has exhibited little genuine interest in actually publishing this coffee table book, up until the point when this litigation commenced. Only after the litigation began did he take any substantial steps toward considering publication of the book. On this issue, Plaintiffs rely on the Second Circuit's decision in Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc., 150 F.3d 132 (2d Cir. 1998), where the court stated that "[i]t would . . . not serve the ends of the Copyright Act—i.e., to advance the arts—if the artists were denied their monopoly over derivative versions of their creative works merely because they made the artistic decision not to saturate those markets with variations of their original." Id. at 146.

Plaintiffs' reliance, however, is misplaced. Castle Rock concerned a plaintiff that had, and continued to, exploit its copyright over the Seinfeld television program and derivative markets. Id. at 136. The only issue in that case was whether a decision to not exploit one particular derivative market should be respected. The underlying facts of the case at hand are substantially different. Warren not only failed to use his copyright to exploit a particular derivative market, but he has both failed to exploit any derivative market and failed to even exploit the copyrights in their entirety for the past several decades. This is not a case of a court's need to respect the artistic decisions of the copyright owner who decides to exploit one derivative market but not another; instead, this is a case where the copyright owner has exhibited virtually no interest at all in utilizing his copyrights. It would defy logic for this Court to accept Warren's argument that, where a copyright owner has failed to utilize his copyrights for several decades, a district court's prohibition of a defendant's productive and transformative use serves copyright's

-39-

"purpose, '[t]o promote the Progress of Science and useful Arts . . . .'" Campbell, 510 U.S. at 575 (quoting U.S. Const. art. I, § 8). This alone places the fourth factor in favor of Spurlock.

Nonetheless, assuming that it does somehow serve the purposes of copyright to prevent others from utilizing a copyright that was deserted decades ago, the parties have offered several pieces of evidence in support of their arguments on the fourth factor. Spurlock, who has the burden to satisfy the fair use defense and the four factors, offers a number of individuals' testimony in support of his argument that the market for the coffee-table book was not harmed by the Gogos Book.

- Robert Greenberger, who is an agent of Philip Kim, the current owner of the Famous Monsters of Filmland trademark, testified that the Gogos Book did not "adversely affect[] my interest, Mr. [Philip] Kim's interest, or the interest of Abrams [a publisher] in publishing a coffee table book celebrating the 50th Anniversary of the original Famous Monsters of Filmland magazine." (Greenberger Aff. ¶ 8).[20]  Kim and Greenberger had previously expressed some interest in working on the coffee-table book.

- Jon Cooke, Warren's supposed "project manager" for the coffee-table book, also testified that he did not believe any publication adversely affected Mr. Warren's right to license Famous Monsters. (Cooke Dep. 59:23-60:19).

- Charles Kochman, the only publisher that Warren or a person acting on behalf of Warren ever approached, testified that he believes the Gogos Book did not have

---

[20] Plaintiffs respond to the Greenberger affidavit by saying that he does not have the experience or expertise to make this opinion.

any impact on the market for a book about <u>Famous Monsters</u>. (Kochman Aff. ¶¶ 12, 13).[21,22]

In response to Spurlock's evidence, Plaintiffs make several arguments concerning the fourth factor. Many of those arguments, however, miss the mark. Plaintiffs first argue that this Court should use a "functional test," offered in the respected treatise <u>Nimmer on Copyright</u>, to determine whether the market was harmed. This test relies on one prong of the first factor, whether the work is transformative, in coming to a conclusion on whether there was market impact. <u>See</u> 4 <u>Nimmer on Copyright</u>, § 13.05[B][1], at 13-206 ("In determining the effect of the defendant's use upon the potential market for or value of the plaintiff's work, a comparison must be made not merely of the media in which the two works may appear, but rather in terms of the function of each such work regardless of media."). However, Plaintiffs have not identified any cases where courts have adopted this test, and a review of the Third Circuit and Supreme Court cases shows that neither of these courts has done so. Even if this test was applied, this Court would conclude that the function of Plaintiffs' use of the magazine covers is distinctly different than the function of Spurlock's use in the Gogos Book, for the same reasons that were discussed in the first factor analysis.

Next, Plaintiffs rely on evidence to establish that there is a valuable market for <u>Famous</u>

_____

[21] Plaintiffs argue that Kochman has no knowledge of the content of the proposed coffee table book and no knowledge of the content of the Gogos Book.

[22] As these pieces of testimony are to some extent lay opinion testimony, the Court will give them very minimal weight.

Monsters derivative works.[23]  But Spurlock does not dispute this issue, and he repeatedly notes that a Famous Monsters coffee-table book would be readily accepted by a publisher (though he insists that the Gogos Book does not impact the market for such a book).

Plaintiffs also offer a statement by one of their experts, Dennis Kitchen, that, if the Gogos Book does poorly, this would poison the market for the Famous Monsters coffee-table book. (Kitchen Rep. ¶ 13).  Even if this is true, Plaintiffs did not point to any evidence that speaks to the premise of his conclusion—whether the Gogos Book sold poorly.

Finally, Plaintiffs contend that the market for the coffee-table book is likely usurped since the Gogos Book would probably be placed beside a Famous Monsters coffee-table book in the bookstore, or would show up together as results for likely-used keywords in an online bookstore search.  Yet, Plaintiffs did not offer any testimony or evidence in support of either of these assertions.

Plaintiffs provide several statements on the fourth factor that do address the relevant issue:

- Warren states in his declaration that "Defendant's visually-oriented book · which is based on substantial part on the covers and original artwork of Plaintiffs' Famous Monsters of Filmland magazines, has been published first and is still publicly available – has preempted Plaintiffs' own plans for a book comprising and featuring the covers and original artwork of their Famous Monsters of

---

[23] (Spurlock Dep. 1/28/09 148:15-24); (Spurlock Dep. 1/28/09 332:20-333:7) (stating that he is willing to publish a book concerning the Famous Monsters magazines); (Kochman Aff. ¶¶ 4-5) (stating that there is a market for a Famous Monsters coffee table book); (Warren Decl. ¶¶ 22, 25) (stating that he is often asked about engaging in derivative projects).

Filmland magazines." (Warren Decl. ¶ 12).[24]

- Kitchen states that "[t]he book Famous Monster Movie Art of Basil Gogos, having been published first and containing a substantial amount of covers and cover art from Famous Monsters of Filmland, likely hampers Warren's plans for a book featuring the covers and cover art of Warren's Famous Monsters of Filmland magazines." (Kitchen Rep. ¶ 9).[25]

- Samuel Kursh, Plaintiffs' other expert, concluded that, in considering the evidence in the light favorable to Plaintiffs, "Warren has been permanently precluded from exploiting the intellectual property as a result of Spurlock's alleged infringement, [and] the loss of opportunity would approximate the value of the property or $1 million." (Kursh Rep. ¶ 59).

Warren's complete failure to exploit his copyrights for approximately 22 years substantially detracts from his argument on the fourth factor. The parties' opposing arguments and supporting evidence on the other market factors are largely based on opinions as to what would have occurred if certain events had taken place. All these conflicting opinions are to a large degree speculative. They do create a genuine issue of fact as to whether the fourth factor is in favor of Plaintiffs or Spurlock. Weighing Plaintiffs' sheer neglect of the copyrights, against the result of making all factual inferences in favor of Plaintiffs as to the other facts as must be done on summary judgment, based on Warren's own testimony and the supporting testimony

---

[24] Spurlock argues that this testimony is a legal conclusion and self-serving, and he contends that it should therefore be excluded from evidence.

[25] As noted earlier, Kitchen is the subject of a pending motion in limine.

from others, the Court finds that the fourth factor slightly favors Plaintiffs. See Campbell, 510 U.S. at 591 n.21 ("Market harm is a matter of degree, and the importance of this factor will vary, not only with the amount of harm, but also with the relative strength of the showing on the other factors.").

### 6.   Consideration of All Fair Use Factors

This Court concludes that the fair use factors, considered as a whole, weigh in favor of Spurlock. The strong weight of the first and third factors in favor of Spurlock, along with the limited relevance of the second factor, warrant a finding on fair use for the Defendant, despite the disputed facts on the fourth factor, which, when inferred in favor of Plaintiffs, slightly favors Plaintiffs.

It is important to again recognize that the four factors are not "a score card that promises victory to the winner of the majority." Video Pipeline, 342 F.3d at 198 (quoting Leval, supra, at 1110). The fair use factors are "to be explored, and the results weighed together, in light of the purposes of copyright." Id. (quoting Campbell, 510 U.S. at 578). After weighing the factors together and considering the purposes of copyright, this Court determines that the fair use defense is appropriate here. The fact that the Gogos Book is inherently biographical render it so fundamentally transformative in nature, coupled with the fact that Spurlock utilized such a quantitatively and qualitatively minor portion of the magazines, requires this Court to conclude that Spurlock's use is fair use and to grant Spurlock's motion for summary judgment on the copyright claims.

## IV.   Unfair Competition

Spurlock also moves for summary judgment on Plaintiffs' state law unfair competition

-44-

claim. In Count II of their Amended Complaint, Plaintiffs argue that the name of the Gogos

Book, Famous Monster Movie Art of Basil Gogos, suggests an affiliation with the Famous

Monsters of Filmland magazine and uses the "goodwill and reputation" that Plaintiffs have

garnered with the "success and favorable public acceptance and recognition" of the Famous

Monsters magazine.

### A.    Principles of Analyzing Unfair Competition Claim

The threshold issue for Count II is determining what principles govern an unfair

competition claim. Despite several cases identifying standards to be used on these claims, there

is no clear precedent on which standard is the appropriate one for this case. Though in many

ways the standards are analytically similar, if not identical, there are at least three different

standards that courts have used.

First, Spurlock argues that the unfair competition claim should be analyzed as if it was a

Lanham Act claim of unfair competition. Many judges in this District have adopted this view

and directly held that "[t]he elements of an unfair competition claim under Pennsylvania

common law are identical to those required under the Lanham Act, except that no showing

regarding interstate commerce is necessary under Pennsylvania law." Allen-Myland, Inc. v. IBM

Corp., 746 F. Supp. 520, 552-53 (E.D. Pa. 1990) (O'Neill, J.) (utilizing Lanham Act standard for

counterclaim where defendant argued that plaintiff engaged in unfair competition by "affixing

counterfeit IBM labels to copies of the 3090 microcode which it made and distributed to

customers; and by displaying IBM's copyright notice on the 3090 system operator console screen

-45-

when a 3090 system powers up using [the counterclaim defendant's] copied 3090 microcode").[26]

The second standard used for unfair competition focuses on whether the defendant was "passing off" a good as if it was produced by the plaintiff.  As Judge Brody explained in Bldg. Materials Corp. of Am. v. Rotter, 535 F. Supp. 2d 518 (E.D. Pa. 2008) (Brody, J.), "[a] claim of unfair competition under Pennsylvania law requires proof that the defendant has 'passed off' the goods of one manufacturer or vendor as those of another, thus creating confusion between his own goods, and those of the rival." Id. at 526 n.4 (quoting Scanvec Amiahle Ltd. v. Chang, 80 Fed. Appx. 171, 180 (3d Cir. 2003), citing to Pa. State Univ. v. Univ. Orthopedics, Ltd., 706 A.2d 863, 870-71 (Pa. Super. Ct. 1998)); see also Mainardi v. Prudential Ins. Co. of Am., 2009 WL 229757, at *9-10 (E.D. Pa. Jan. 30, 2009) (Pratter, J.).[27]

_____

[26] For examples of other cases in the Eastern District of Pennsylvania that utilize the Lanham Act standard for Pennsylvania common law unfair competition claims, see Strick Corp. v. Strickland, 162 F. Supp. 2d 372, 375 (E.D. Pa. 2001) (Kauffman, J.) (alleging a likelihood of confusion due to defendant's use of plaintiff's name for internet website address); Am. Fid. & Liberty Ins. Co. v. Am. Fid. Group, 2000 WL 1385899, at *13 (E.D. Pa. Sept. 25, 2000) (Yohn, J.) (alleging defendant's "use of a mark beginning with 'American Fidelity' in connection with the sale of insurance policies covering long term care"); Game Power Headquarters, Inc. v. Owens, 1995 WL 273663, at *3 (E.D. Pa. May 4, 1995) (Broderick, J.) (alleging defendant's use of the phrase "Game Power" in renting video games at the same time the plaintiff owned the trademark to "Game Power Headquarters" for the use of video game rental stores); Regal Indus., Inc. v. Genal Strap, Inc., 1994 WL 388686, at *2 (E.D. Pa. July 26, 1994) (Yohn, J.) (alleging defendant's use of the terms SPORTSTRAP and SPORT STRAP despite the plaintiff's federally registered trademark SPORTSTRAP); Moore Push-Pin Co. v. Moore Bus. Forms, Inc., 678 F. Supp. 113, 116 (E.D. Pa. 1987) (Ludwig, J.) (alleging the defendant's use of the name "Moore" for product marketing).

[27] In Rotter, Judge Brody weighed the use of the "passing off" principle and the Restatement in considering the plaintiff's motion to dismiss an unfair competition counterclaim, which alleged that the plaintiff had blocked the supply of an essential component for a product the defendant developed and sold.  535 F. Supp. 2d at 522-23.
    In Scanvec, the Third Circuit issued a non-precedential opinion discussing an unfair competition claim, which alleged that the defendants, who used to own the plaintiff software company, used certain components from software owned by the plaintiff, falsified the copyright

Finally, the third standard utilized for a common law unfair competition claim comes

from the Restatement (Third) of Unfair Competition: "In recent years, the Pennsylvania Court of

Common Pleas has begun to define unfair competition according to its definition in the

Restatement (Third) Unfair Competition § 1 (1995)." Rotter, 535 F. Supp. 2d at 526 n.4 (citing

Babiarz v. Bell Atl.-Pa., Inc., 2001 WL 1808554, at *9 (Pa. Com. Pl. July 10, 2001); Lakeview

Ambulance & Med. Servs., Inc. v. Gold Cross Ambulance & Med. Serv., Inc., 1995 WL 842000

(Pa. Com. Pl. Oct. 18, 1995)).[28] The Restatement provides that:

---

information for those components, then utilized the plaintiff's distribution network to sell the
new software. 80 Fed. Appx. at 180. Though the court decided that the issue was not
appropriately considered on appeal since the defendant did not sufficiently challenge the district
court's decision, it also determined that the "passing off" theory was the legal principle
applicable to the claim.

In Pa. State, the Pennsylvania Superior Court considered an appeal on a common law
unfair competition claim brought by Penn State University against the defendant, University
Orthopedics. The plaintiff claimed that the defendant's use of the term "University" was
sufficiently misleading to establish liability under Pennsylvania common law. Though the Third
Circuit's quotation from this case in Scanvec may suggest that an unfair competition claim is
unrelated to the Lanham Act, the Superior Court's decision indicates otherwise: "Federal law . . .
serves as persuasive authority because, for many years, it governed these areas almost exclusively
and spawned a large body of federal decisions. As with federal law, the common law of
trademarks is a portion of the broader law of unfair competition." 706 A.2d at 870 (internal
citations omitted).

In Mainardi, Judge Pratter considered a defendant's motion to dismiss the plaintiff's
unfair competition claim, where the plaintiff alleged that the defendant misled the plaintiffs into
believing that they were interested in purchasing the plaintiffs' instructional sales software, but
instead developed their own software based on the same principles and sales techniques. 2009
WL 229757, at *1-4.

[28] In Babiarz, the plaintiff, who was an employee of the defendant, brought an unfair
competition claim against his employer. The plaintiff alleged that the employer created a
program seeking to encourage the employees to provide new ideas and strategies for the
employer. After the plaintiff provided a new retail marketing strategy, the employer appropriated
the idea without providing the plaintiff with additional compensation or recognition. In essence,
the defendant's actions were "alleged to constitute unfair competition by appropriation of a trade
secret and unlawful appropriation of an invention from its rightful inventor, resulting in the
destruction of plaintiff's patent rights." 2001 WL 1808554, at *10.

> One who causes harm to the commercial relations of another by
> engaging in a business or trade is not subject to liability to the
> other for such harm unless:
> (a) the harm results from acts or practices of the actor actionable by
> the other under the rules of this Restatement relating to:
> > (1) deceptive marketing, as specified in Chapter Two;
> > (2) infringement of trademarks and other indicia of
> identification, as specified in Chapter Three;
> > (3) appropriation of intangible trade values including trade
> secrets and the right of publicity, as specified in Chapter Four;
> > or from other acts or practices of the actor determined to be
> actionable as an unfair method of competition, taking into account
> the nature of the conduct and its likely effect on both the person
> seeking relief and the public.

Restatement § 1.

Despite the fact that there is no clear precedent on what standard applies, this Court

concludes that Lanham Act principles are appropriately applied in this case.  In considering the

foregoing review of modern unfair competition cases, those cases applying the Lanham Act, the

plaintiffs generally argue that the defendant has utilized a name, title, or "mark" that is associated

with the plaintiff, with the intent of falsely linking the defendant's product with the plaintiff and

capitalizing on the plaintiff's goodwill.  On the other hand, where courts apply principles other

than the Lanham Act, the plaintiff's claim typically consists of allegations that the defendant was

engaged in some "unfair" trade practice, other than appropriating the plaintiff's "mark."

Two cases in particular require some additional consideration.  First, the Third Circuit's

decision in Scanvec could be interpreted as a case where the defendants appropriated a mark

---

In Lakeview, the plaintiff was a company that provided ambulance services that sought to
enter a new geographic market.  Upon its attempt to enter the market, the plaintiff alleged that the
defendant "embarked on a campaign to block expansion into the area" by way of false statements
to the public and press, seeking to have the plaintiff's certification denied, and violating state
laws and regulations.  1995 WL 842000, at *1.

owned by the plaintiff. However, several factors underlie this Court's hesitation to apply the Third Circuit's non-precedential decision to the facts at hand. Scanvec first determined that the unfair competition claim was not sufficiently preserved on appeal. 80 Fed. Appx. at 180. Despite the fact that the court could not "determine the factual and legal basis for Amica's purported appeal," id., the court proceeded to consider what principle was appropriately applied in that case. In addition, the allegations in Scanvec were not limited to misrepresentation of ownership of the defendant's product, but included claims that the defendants utilized valuable intellectual property from the plaintiff's software and that the defendants took over the plaintiff's distribution network.

The other case that requires some consideration is the Pennsylvania Superior Court's decision in Pa. State. Though the allegations in that case   that the defendant's inclusion of the term "university" in its company name misleads the public into believing there is an affiliation with Penn State University—are comparable to the facts here, the court explicitly recognized in that case that federal principles are effective in considering an unfair competition claim. 706 A.2d at 870. By no means can the Superior Court's opinion be characterized as a rejection of Lanham Act principles for unfair competition claims.

Scanvec and Pa. State are distinguishable, and in light of the many analytically identical cases discussed above that use the Lanham Act in coming to a decision, this Court will use the Lanham Act in considering Plaintiffs' common law unfair competition claim against Spurlock.

### B.     Principles Under the Lanham Act

In Spurlock's Motion for Summary Judgment, he analyzes Plaintiffs' unfair competition claim in the context of the Lanham Act. Spurlock first argues that Warren can not pursue this

claim since the trademark on <u>Famous Monsters of Filmland</u> is now owned by Philip Kim, not Warren.

Plaintiffs do not contest Kim's ownership of the trademark in their Response. Instead, Plaintiffs argue that they still have a protectable, or a common law, right to the name under the Lanham Act. While Spurlock does not challenge the fact that Plaintiffs at one time had a common law right to the name, he argues that Plaintiffs are precluded from pursuing a claim both because a third party now owns the registered trademark and because Plaintiffs abandoned ownership of the mark when Warren ceased publication of the <u>Famous Monsters</u> Magazine.

This Court recently recognized the elements of an unfair competition claim under the Lanham Act in <u>AFL Philadelphia LLC v. Krause</u>, 2009 WL 1562992, at *4 (E.D. Pa. June 4, 2009) (Baylson, J.):

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A). "Overall, '[t]he Lanham Act was intended to make actionable the deceptive and misleading use of marks and to protect persons engaged in . . . commerce against unfair competition.'" <u>Krause</u>, 2009 WL 1562992, at *4 (quoting <u>Two Pesos, Inc. v. Taco Cabana, Inc.</u>, 505 U.S. 763, 767-68 (1992)). This particular section of the Lanham Act "protects qualifying unregistered trademarks, and the general principles to qualify a registered mark are

largely applicable in determining whether an unregistered mark qualifies for protection under Section 43(a)." Id. (quoting Two Pesos, 505 U.S. at 768). A plaintiff pursuing a claim under this section must provide evidence to establish that "(a) the mark is valid and legally protectable, (b) it owns the mark, and (c) the defendant's use of the mark to identify goods or services causes a likelihood of confusion." Id. (citing Freedom Card, Inc. v. JPMorgan Chase & Co., 432 F.3d 463, 470 (3d Cir. 2005)).

However, Spurlock has not challenged Plaintiffs' ability to satisfy the elements of the Lanham Act at the time the Famous Monsters magazine was published, but instead contends both that: (a) a third party, Philip Kim, now owns the trademark, which precludes Plaintiffs from claiming that they "own" the mark; and (b) that, while Plaintiffs did have at least a "common law" right to the mark back when the Famous Monsters magazine was published, Plaintiffs abandoned ownership of the mark when publication of the Magazine ended in 1983.

### C.   Third Party Ownership of the Mark

Spurlock's first argument is that Plaintiffs do not have standing to pursue the claim since Plaintiffs are no longer owners of the trademark. Spurlock contends that even though there may be some association of the Gogos Book title with the Famous Monsters Magazine, "if Defendant were liable to anyone for Trademark Infringement, it would be Philip Kim - the owner of the Federal Trademark Registration - not Plaintiffs." Plaintiffs respond by arguing that, under the Lanham Act, a plaintiff need not own the trademark to successfully pursue the claim, even where a third party does own the registered trademark. In addition, Plaintiffs claim that the appropriate analysis is whether the plaintiff's right to the mark is superior to the defendant's, not whether plaintiff's is superior to any other person's.

-51-

As Plaintiffs note in their brief, Spurlock's argument concerning the rights of a third party has been termed a jus tertii defense. A party makes a jus tertii argument in a trademark case when the "'[d]efendant in effect argues that, "Somebody has a right to sue me, but it's not you."' The Second Circuit has disfavored this defense.'" General Cigar Co., Inc. v. G.D.M., Inc., 988 F. Supp. 647, 661 (S.D.N.Y. 1997) (Sweet, J.) (quoting 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 31:157, at 31-240 (1996) (hereinafter "McCarthy on Trademarks")). From a review of the cases that discuss this defense, Professor McCarthy's trademark treatise appears to be the leading authority on this issue. In his discussion of jus tertii, Professor McCarthy states that "[m]odern decisions have rejected a jus tertii defense in trademark litigation." 6 McCarthy on Trademarks § 31:160 (citing Tex. Tech Univ. v. Spiegelberg, 461 F. Supp. 2d 510 (N.D. Tex. 2006); Bishops Bay Founders Group, Inc. v. Bishops Bay Apartments, LLC, 301 F. Supp. 2d 901 (W.D. Wis. 2003); General Cigar Co., 988 F. Supp. 647). He also illustrates how a court's acceptance of this argument would lead to negative consequences: A court's permission of jus tertii "would expand many trademark disputes far beyond a mere two-party conflict. Before plaintiff could prevail, it would have to prove that it was not an infringer of one or more third parties that the defendant can conjure up. . . . A case could be expanded beyond reasonable bounds and effectively slowed to a crawl." 6 McCarthy on Trademarks § 31:160.

As Plaintiffs also note, Plaintiffs need not own a registered trademark for the mark at issue to prevail in their Lanham Act claim, even where another party does own one. The most recent case to address this issue is Dallas Cowboys Football Club, Ltd. v. Am.'s Team Props., Inc., 616 F. Supp. 2d 622 (N.D. Tex. 2009). In that case, the court recognized that an

individual's ownership of a trademark does not necessarily prevent another party from asserting

priority.

> It is a fundamental premise that "[t]he exclusive right to a
> trademark belongs to one who first uses it in connection with
> specified goods." Blue Bell v. Farah Mfg., Inc., 508 F.2d 1260,
> 1265 (5th Cir. 1975). Proof of registration of a trademark is only
> prima facie evidence of the registrant's exclusive right to use the
> mark in commerce for the services specified in the registration. 15
> U.S.C. § 1115(a). Such proof does "not preclude another person
> from proving any legal or equitable defense or defect . . . which
> might have been asserted if such mark had not been registered."
> Id. Therefore, the registrant is granted a presumption of
> ownership, dating to the filing date of the application for federal
> registration, and the challenger must overcome this presumption by
> a preponderance of the evidence.

Id. at 632-33. "Neither application for nor registration of a mark at the federal level wipes out

the prior nonregistered, common law rights of others. . . . Thus, in a priority dispute between a

senior common law user and a second-in-time [intent-to-use] applicant, the senior common law

user will prevail." Id. at 633 (quoting 2 McCarthy on Trademarks § 16:18.50).

In the Dallas Cowboys case, there was a dispute between the Dallas Cowboys, who

claimed common law ownership to the term "America's Team," and the company "America's

Team Properties, Inc.," which purchased the registered trademark to that name some years after

the team started using the phrase. The court held that the football team "acquired common law

rights in the 'America's Team' mark more than a decade before Defendant's predecessor in

interest. Thus, the Cowboys have trademark priority." Id. at 634. In the absence of Third

Circuit law on these issues, this Court will adopt the principles of these cases.

Both of Spurlock's arguments for this defense have been rejected by prior courts, and he

has not offered any caselaw to suggest otherwise. Therefore, Kim's ownership of the trademark

Famous Monsters of Filmland will not be considered for purposes of Spurlock's Motion for

Summary Judgment.

### D.    Abandonment of the Mark

#### 1.    Principles on Doctrine of Abandonment

Next, Spurlock argues that even if Plaintiffs can pursue their unfair competition claim

where a third party owns the trademark, any common law rights that Plaintiffs once had were

abandoned by non-use of the mark over many years.  Spurlock contends that Plaintiffs have not

used the Famous Monsters of Filmland mark since 1983, when the magazine ceased publication,

and that Warren's appearances at tradeshows along with third-party resale of the magazine are

not sufficient for Plaintiffs to avoid abandonment of the mark.  Plaintiffs respond by arguing that

Warren also has used the mark as a means to sell memorabilia at movie-monster conventions and

that the mark currently retains an association with the magazine and Warren.

Under the Lanham Act, a mark is considered abandoned when either:

> (1) "its use has been discontinued with intent not to resume such
> use.  Intent not to resume may be inferred from circumstances.
> Nonuse for 3 consecutive years shall be prima facie evidence of
> abandonment.  'Use' of a mark means the bona fide use of such
> mark made in the ordinary course of trade, and not made merely to
> reserve a right in a mark"; or
> (2) "any course of conduct of the owner, including acts of omission
> as well as commission, causes the mark to become the generic
> name for the goods or services on or in connection with which it is
> used or otherwise to lose its significance as a mark.  Purchaser
> motivation shall not be a test for determining abandonment under
> this paragraph."

15 U.S.C. § 1127.[29]  As Judge (now Justice) Alito explained in Marshak v. Treadwell, 240 F.3d

---

[29] Whether the three-year nonuse presumption of abandonment applies in this case, in
which Plaintiffs claim ownership of a common law mark, is discussed below.

184 (3d Cir. 2001), "[t]o establish the defense of abandonment it is necessary to show not only acts indicating a practical abandonment, but an actual intent to abandon." Id. at 198 (quoting Saxlehner v. Eisner & Mendelson Co., 179 U.S. 19, 31 (1900)). As the statute indicates, however, the requisite intent "may be inferred from circumstances." Id. (quoting § 1127). "[A]bandonment, being in the nature of a forfeiture, must be strictly proved." Doeblers' Pennsylvania Hybrids, Inc. v. Doebler, 442 F.3d 812, 822 (3d Cir. 2006) (reversing grant of summary judgment on abandonment where mark was continuously used by licensee).

### 2.   Cases Relied on by Spurlock

In support of Spurlock's abandonment argument, he cites Kusek v. Family Circle, Inc., 894 F. Supp. 522 (D. Mass. 1995). In Kusek, the plaintiff created and published a book of recipes that included the trademark "Speed Cooking," though the mark was not registered. The defendant magazine, Family Circle, became aware of the book and requested copies for a possible article concerning the plaintiff and her book. Though nothing ever became of the magazine article profiling the plaintiff, Family Circle published articles using the mark Speed Cooking, without any acknowledgment that it came from the plaintiff; Family Circle eventually registered the mark. The plaintiff filed suit, alleging, inter alia, trademark infringement. On a motion for summary judgment, Family Circle challenged the plaintiff's ability to satisfy the statute of limitations, which was based on Family Circle's last "use" of the mark in commerce.

The district court, holding that "use" for purposes of the statute of limitations was identical to the "use" considered in abandonment, 894 F. Supp. at 533, rejected the plaintiff's argument that the sale of back magazine issues was sufficient to constitute "use," id. After reciting the general principles of abandonment, the court held that "Family Circle's

-55-

inconsequential use of the trademark Speed Cooking, were it making back issues available, cannot forestall abandonment." Id.

> "To prove bona fide usage, the proponent of the trademark must demonstrate that use of the mark has been deliberate and continuous, not sporadic, casual or transitory." La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc., 495 F.2d 1265, 1271-72 (2d Cir. 1974) . . . . In essence, nominal or residual use is not sufficient to avoid abandonment. See Hiland Potato Chip Co. v. Culbro Snack Foods, Inc., 720 F.2d 981, 984 (8th Cir. 1983) (resale of returned potato chips not sufficient use to avoid abandonment). Minimal use of a mark, which use is not part of an "ongoing program to exploit the mark" is insufficient to vest a party with trademark rights. Anvil Brand, Inc. v. Consolidated Foods Corp., 464 F. Supp. 474, 481 (S.D.N.Y. 1978), citing La Societe Anonyme des Parfumes Le Galion v. Jean Patou, Inc., supra.

894 F. Supp. at 533. Because the "availability of back magazine issues is indistinguishable from such nominal, inconsequential uses," id., the court determined that the last "use" for purposes of the statute of limitations could not be measured with the sale of these back issues, id.

Spurlock appropriately analogizes Kusek to the facts here. The evidence offered by Spurlock establishes that Warren's attempts to "exploit the mark" prior to Spurlock's use were limited to his sporadic attendance at trade conventions, where he would sell back magazine issues or Famous Monsters paraphernalia that were in his personal collection, and his consideration of a Famous Monsters coffee table book. The sale of back Famous Monster issues is identical to the "use" offered by the plaintiff in Kusek, which the court rejected. Any personal memorabilia that Warren may have sold from his personal collection is no different than back issues of the magazine. And the evidence concerning the coffee table book demonstrates that Warren has yet to actually "exploit the mark." The only acts that he has taken in furtherance of

the book has been limited to sketching ideas and talking the issue over with colleagues. As

Kusek correctly recognizes, this type of act is not the type of "bona fide use" the statute requires,

and it is therefore not enough to avoid abandonment of the mark.

### 3.    Whether Lanham Act Prima Facie Abandonment Presumption Applies

There is a brief, but significant, disagreement between the parties as to whether the

statutory presumption of abandonment upon three years of nonuse is applicable here. As the

statute is currently written, § 1127 states that "[n]onuse for 3 consecutive years shall be prima

facie evidence of abandonment." At one point, the statute provided for the presumption where

there was nonuse for two consecutive years. See Emergency One, Inc. v. Am. FireEagle, Ltd.,

228 F.3d 531, 536 n.1 (4th Cir. 2000) ("Effective January 1, 1996, Congress amended § 1127,

changing the period of non-use that establishes a prima facie case of abandonment from two

years to the present standard of three years.").

The complicating factor in this case concerns the fact that Plaintiffs are asserting a claim

to common law ownership of the mark "Famous Monsters of Filmland," rather than ownership

based on a registered trademark. From a review of the caselaw and McCarthy on Trademarks,

there appears to be no consensus on whether the rebuttal presumption of abandonment applies to

common law ownership of marks. Compare Koppers Co. v. Krupp-Koppers GmbH, 517 F.

Supp. 836, 854 (W.D. Pa. 1981) ("The K-T marks are not registered under federal law.

Therefore the two-year discontinuance presumption of the Lanham Act does not apply to

Koppers Co.'s rights to the marks."), with 3 McCarthy on Trademarks § 17:21 ("This

presumption has even been applied to an unregistered common law trademark." (citing Miller

-57-

Brewing Co. v. Oland's Breweries (1971), Ltd., 548 F.2d 349 (C.C.P.A. 1976))); Gen. Healthcare Ltd. v. Qashat, 364 F.3d 332, 336 (1st Cir. 2004) (affirming district court's grant of summary judgment on abandonment by applying three year nonuse presumption of abandonment to a common law mark).

If this prima facie abandonment rule applies to common law marks, it is clear to this Court that Plaintiffs have failed to rebut the presumption with sufficient evidence, and Plaintiffs therefore abandoned the Famous Monsters mark. The presumption of abandonment serves to "shift the burden of production to the mark owner to come forward with evidence indicating that, despite three years of non-use, it intended to resume use of the mark within a reasonably foreseeable time. The ultimate burden of persuasion . . . remains . . . with the alleged infringer." ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 148 (2d Cir. 2007). Where the mark owner seeks to rebut the presumption, the evidence of the "mark holder's intent to resume use of the mark must be formulated during the three-year period of non-use." Id. at 149 n.9.

In ITC, the plaintiff company owned several successful restaurants throughout the world, all named and based off of its restaurant in India named "Bukhara." ITC opened a restaurant with the Bukhara mark in New York City in 1986, opened another in Chicago in 1987, and registered the Bukhara mark for restaurant services that same year. However, the restaurants only remained open for a few years; the New York restaurant closed in 1991, and the Chicago restaurant closed in 1997. After 1997, Bukhara did not use the mark for restaurants in the United States and only resumed its use in 2003 for the sale of packaged food products. In 1999, several former employees of the plaintiff opened two restaurants, which bore the Bukhara mark and were specifically designed to copy the plaintiff's restaurants. ITC filed suit in 2003 for, inter alia,

trademark infringement and unfair competition under the Lanham Act. The district court granted

the defendants' motion for summary judgment on the issue of abandonment, and ITC appealed.

On appeal, ITC conceded that the defendants had established that the mark had not been used in

the United States since 1997, thereby triggering the statutory presumption of abandonment, but

argued that there was a genuine issue of fact as to whether it intended to resume use of the mark.

Id. at 147.

The court first noted that ITC's blanket assertion of an intent to resume use during the

nonuse period was insufficient to rebut the statutory presumption, stating that the mark owner

must instead "come forward with evidence 'with respect to . . . what outside events occurred

from which an intent to resume use during the nonuse period may reasonably be inferred." Id. at

150 (quoting Imperial Tobacco, Ltd. v. Philip Morris, Inc., 899 F.2d 1575, 1581 (2d Cir. 1990)).

ITC offered four different sets of evidence in support of its intent to resume use of the mark:  (1)

overly burdensome Indian regulations and depressed market conditions for restaurants, "(2) its

efforts to develop and market a Dal Bukhara line of packaged food, (3) its attempts to identify

potential United States restaurant franchisees, and (4) its continued use of the Bukhara mark for

restaurants outside the United States." Id. at 151.

As to the first, the court held that there was no evidence that the regulations of India were

too burdensome for the restaurants to operate, and that there was no evidence of a decline in the

United States hospitality market.  Id. at 151-52.  As to the second, the court found that the only

evidence within the three-year period of nonuse was a meeting minute indicating an intent to sell

food products under the name "Bukhara Dal," though the minutes did not reflect an intent to sell

the products in the United States or to resume use of the mark for Untied States restaurants.  Id.

at 152. As to the third, the court held that the business proposals ITC received, with no evidence of serious consideration by the plaintiff, were also insufficient. Id. at 152-53. Finally, the court held that use of the mark outside the United States could not show an intent to use the mark inside the United States. Id. at 153. The court determined that ITC abandoned the mark and affirmed the district court's grant of summary judgment. Id.

The ITC opinion is an effective guide as to how Warren failed to rebut the presumption of abandonment, if the statutory presumption applies to common law marks. From 1983 until 2006, as will be more throughly discussed below, the evidence offered by Spurlock establishes that Warren failed to make any "bona fide use" of the Famous Monsters mark in commerce.[30] Instead, the mark was completely removed from commerce after the Famous Monsters magazine ceased publication in 1983. There are several three-year periods, then, after 1983 that this Court could identify for the statutory presumption. For instance, from 1983 until 1986, the evidence offered by Spurlock, and which Warren failed to rebut, indicates that there was no bona fide commercial use of the mark. The same could be said of any other three-year period up to 2006. The only evidence offered by Warren—two attempts to protect the mark from third-party use, Warren's occasional attendance at trade conventions to sell back issues, and his contemplation of publishing a coffee-table book—do not indicate an "ongoing program to exploit the mark" and

---

[30] Despite some argument by Plaintiffs on the copyright ownership issue that Harris never owned the rights to the Famous Monsters properties, see (Part III.A.2), Plaintiffs now argue that Harris did become a successor-in-interest to the Famous Monsters mark in 1983. For ease of reference and clarity, in discussing usage of the mark from 1983 until Warren and Harris came to a settlement around 1998, it should be presumed that this Court is considering the evidence on the record concerning Harris's use of the mark during that time period. However, the evidence offered by Spurlock indicates that Harris also failed to use the mark, other than to register it in 1991. As discussed below, registration of the mark is not the type of activity the Copyright Act classifies as "use" in commerce.

are therefore not adequate usage.

Because Spurlock can readily establish a three-year period of nonuse, Plaintiffs would then be required to rebut the presumption by producing evidence that "that, despite three years of non-use, it intended to resume use of the mark within a reasonably foreseeable time." ITC, 482 F.3d at 148. Warren has failed to do so. Each piece of evidence offered by Plaintiffs only indicates an intent to protect the mark (not to resume use of it), an intent to engage in sporadic sales of personal memorabilia or back magazine issues (which Kusek recognizes is not bona fide usage), or insubstantial consideration of publishing this coffee-table book. This last piece of evidence is an important one, since it is the focus of Plaintiffs' claims of intent to resume use. However, the ITC court's handling of evidence similar to what Warren offers here, business proposals to exploit the mark that ITC never seriously considered, indicates that simple business proposals or ideas do not independently prove sufficient intent. ITC, 482 F.3d at 152-53 ("[N]o evidence indicates that ITC responded to or seriously considered these unsolicited proposals in a manner that would permit a reasonable jury to infer its intent to resume use of its Bukhara mark for restaurants."). Rather, an intent to resume use of the mark can only come from evidence that shows a genuine and substantial consideration of a business idea where use of the mark would be resumed. Warren's coffee-table book simply does not rise to that level.

In sum, the evidence offered by Spurlock would trigger the statutory presumption of nonuse, and Warren would be unable to rebut the presumption with the evidence offered here. Therefore, if Warren's common law ownership of the Famous Monsters mark was subject to the three-year nonuse statutory presumption of abandonment, the evidence on the record establishes that Warren abandoned the mark.

4.   **Cases Relied on by Plaintiffs**

However, as discussed above, there is no binding precedent as to whether the statutory presumption applies to common law marks. The facts will be considered in the alternative under the general principles of abandonment.

In support of their argument that Warren did not abandon the Famous Monsters mark, Plaintiffs rely on three cases: Ferrari S.p.A. Esercizio Fabbriche Automobili e Corse v. McBurnie, 1989 WL 298658 (S.D. Cal. June 1, 1989), Skippy, Inc. v. CPC Int'l, Inc., 674 F.2d 209 (4th Cir. 1982), cert. denied, 459 U.S. 969 (1982), and Marshak v. Treadwell, 240 F.3d 184 (3d Cir. 2001). Initially, it should he noted that none of these cases concern summary judgment motions.

In Ferrari, the court granted an injunction in a Lanham Act claim after trial, and found that the car manufacturer Ferrari never abandoned its ownership of the mark "Daytona Spyder." Ferrari produced a car from 1966 to 1974 known as the Daytona Spyder. The Sypder was a very popular and successful model until the end of its production, when Ferrari limited sales to replacement parts for the cars. While the number of cars produced was limited, the Daytona Spyder received high praise from car enthusiasts and critics in books and magazines even after the end of production. The defendant company attempted to replicate Ferrari's design by selling kits that would convert cheaper automobiles into the design of a Daytona Spyder without the Ferrari logo. The defendant argued that Ferrari had abandoned the mark when it ceased production of the car in 1974. The court rejected the defendant's abandonment argument on the basis of Ferrari's supply of replacement parts, its refurbishment and service of the existing cars, and the strong public association that Daytona Spyder had with Ferrari. "[T]he court finds that

-62-

Ferrari never intended to abandon its rights in or use of the DAYTONA SPYDER trade dress and has not abandoned its rights. Ferrari's continuous use of its trade dress has been made in good faith and for valid commercial reasons." 1989 WL 298658, at *1849.

Despite Plaintiffs' emphasis on this case, it is not sufficiently supportive of Plaintiffs' argument. The evidence in Ferrari suggested that Ferrari's decision to end production of the Daytona Spyder was not due to a lack of demand or an attempt to forfeit its rights to the mark. Rather, the evidence indicated that the car was a very successful model and that Ferrari limited the production for strategic purposes. Even after production was ended, Ferrari continued to maintain the cars and create replacement parts for a substantial period of time. The district judge, in granting the injunction, found that Ferrari vigorously retained its common law rights to the mark despite ending production.

The evidence offered by Warren, on the other hand, suggests an effort that pales in comparison to Ferrari's. Since the end of production of Famous Monsters in the early 1980's, Warren has taken virtually no action to retain his common law ownership of the mark. Indeed, for almost 25 years, he has not published another issue of the magazine and has not engaged in a substantial attempt to sell memorabilia or anything else with the Famous Monsters name. And though there are no "replacement parts" for Famous Monsters magazines as there were in Ferrari, Warren provided no evidence of any substantial activity that he engaged in during the past two and a half decades sufficient to retain his rights to the mark.

Plaintiffs also direct this Court's attention to Skippy. In that case, a peanut butter manufacturer, CPC, sought a declaratory judgment that the defendant, Skippy, Inc., abandoned its rights to the mark "Skippy." Skippy, Inc. had previously produced a syndicated comic strip,

-63-

depicting the stories of a child named "Skippy," and derivative products, including lunch boxes and books. Skippy, Inc. registered the trademark to "Skippy" in 1925, and it ended syndication of the comic strip in 1945 when the trademark expired. However, Skippy, Inc. attempted to continue commercializing the trademark through 1980 with limited success. CPC, the plaintiff company, produced Skippy peanut butter and it sought to declare Skippy, Inc.'s rights to the "Skippy" mark as abandoned. In considering the claim on appeal from a non-jury trial, the court focused on several of Skippy, Inc.'s activities: "Skippy, Inc. submitted evidence showing that it continued to attempt to market the Skippy cartoon character and concept after 1945, that the Board of Directors of Skippy, Inc. met occasionally after 1945, and that Skippy, Inc. reemerged as an active company after Tibbetts became president in 1968." 674 F.2d at 216. On the basis of this evidence, the appellate court sustained the district court's finding that "Skippy, Inc. did not intend to abandon its trademark." Id.

Skippy similarly fails to sufficiently support Plaintiffs' case. Skippy, Inc. did not totally cease its attempts to exploit the Skippy mark. Instead, Skippy, Inc. held board meetings and retained an advertising company in an attempt to increase its revenue. Though its attempts met with limited success, it still actively sought to retain its right to the Skippy mark. Once the new president, Tibbetts, took over, its activity became even more substantial. Here, Warren did not engage an advertising agency, did not hold corporate meetings, and made only isolated attempts to exploit the Famous Monsters mark in commerce.

The final case Plaintiffs rely on is the Third Circuit's opinion in Marshak. Marshak concerned the rights to the mark "The Drifters," which was a popular singing group during the 1950's and 1960's. The husband of the defendant was the manager of the singing group during

-64-

this initial period of popularity, and he controlled the rights to the name "The Drifters," which

the defendant, Treadwell, assumed upon his death. In 1969, the plaintiff sought to reunite old

members of The Drifters for a reunion concert in affiliation with CBS Radio. The Drifters'

concert was a great success, and they continued to perform under that name for several years. In

1971, Treadwell sued Marshak for using The Drifters mark in violation of her common law right

to the mark, but the suit was eventually dismissed due to Treadwell's lack of financial resources.

After the suit, Marshak's group continued to perform and protect The Drifters mark. In 1995,

Marshak initiated a suit against Treadwell for authoring a book where she claimed that she was

the sole owner of The Drifters mark, and the parties sought to litigate their disputes over the

mark. At trial, the jury found that Treadwell had initially owned common law rights to the mark,

but abandoned the rights by 1976. After the district court vacated the jury's finding on

abandonment, Marshak appealed.

The Third Circuit affirmed the district court, agreeing that there was no abandonment

where The Drifters' recordings were played on the radio and in the record stores during the prior

40 years. The court agreed with the district court that "[a] successful musical group does not

abandon its mark unless there is proof that the owner ceased to commercially exploit the mark's

secondary meaning in the music industry." 240 F.3d at 199. The court determined that the

defendant's continuous receipt of royalties and re-releasing the songs on compact disk amounted

to a "continuous use of the mark in connection with the commercial exploitation of the group's

recordings," where thereby created "a strong inference of an intent not to abandon the mark." Id.

With no other evidence to suggest otherwise, the court concluded that Treadwell had not

abandoned the mark. Id.

The Third Circuit's opinion in Marshak illustrates what the focus of the abandonment inquiry should be. Even though Treadwell had failed to protect her mark through the litigation with Marshak and others, the court explained that the true inquiry for abandonment was whether the owner attempted "to commercially exploit the mark's secondary meaning in the [] industry." Id. Here, Spurlock has offered sufficient and uncontested evidence to show that Warren engaged in almost no activity that commercially exploited the Famous Monsters mark over the past two and a half decades. Other than the sale of Famous Monsters to Harris in 1983 and the acts in pursuit of the coffee-table book after this litigation began in 2008, Warren's only commercial exploitation has been occasional attendance at trade conventions to sell personal memorabilia. Despite Plaintiffs' reliance on the Marshak opinion, Warren's appearance at trade conventions clearly does not amount to, in the words of then-Judge Alito, a "continuous use of the mark in connection with the commercial exploitation" of Famous Monsters. Id. at 199. Rather, Warren's peddling is more appropriately characterized as "nominal or residual use," which the Kusck court warned was "not sufficient to avoid abandonment." Kusck, 894 F. Supp. at 533 (citing Hiland Potato Chip Co. v. Culbro Snack Foods, Inc., 720 F.2d 981, 984 (8th Cir. 1983)).

### 5. Evidence Offered by Plaintiffs

Finally, Plaintiffs rely on the following pieces of evidence to support their argument that the Famous Monsters of Filmland mark was not abandoned:

- Famous Monsters of Filmland continues to be associated by the public with James Warren and Warren Publishing.

- Warren only stopped publication of Famous Monsters in 1983 due to ill health,

-66-

not with an intent to abandon the mark.[31]

- Harris Communications paid a substantial amount of money for Warren Communications in 1983, which included the rights to Famous Monsters. Warren later initiated a lawsuit against Harris in 1998 claiming ownership, which was ultimately settled.

- In 1995, Plaintiffs were in a dispute with authors of a different book, Monsters Among Us, after Plaintiffs discovered that covers to the Famous Monsters magazine were being used in the book. Plaintiffs eventually settled with the authors agreeing that they would not use the Famous Monsters covers.

- Warren continues to consider making a coffee table book chronicling the history of the Famous Monsters Magazine.

- Warren has attended movie-monster conventions in order to sell back issues of the Famous Monsters Magazine and related memorabilia in his personal collection, though no specific dates have been identified for the conventions.

Nonetheless, these pieces of evidence, even assuming they are true, are insufficient to show a lack of abandonment. Once again, "'[u]se' of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. "Minimal use of a mark, which use is not part of an 'ongoing program to exploit the mark' is insufficient to vest a party with trademark rights." Kusek, 894 F. Supp. at 533.

A recent case from the Eastern District of Pennsylvania, PBI Performance Prods., Inc. v. NorFab Corp., 514 F. Supp. 2d 725 (E.D. Pa. 2007) (Bartle, C.J.), is also illustrative. In that

---

[31] Spurlock disputes this assertion.

case, the plaintiff, PBI, was in the business of designing and selling heat and flame resistant fabric suitable for firefighters' turnout gear. In 2003, PBI registered a trademark for the physical appearance of the heat-resistant material in "a gold background with a black checkered pattern." Id. at 726. From 2001 to 2003, PBI advertised and distributed samples of the material in this pattern. After it became clear that a different color scheme was more appealing to potential customers, PBI stopped its advertisement of the pattern without having made any sales of that design. At a certain point in time, the defendant, NorFab, began selling a fabric for the same purposes in brown with a darker brown checkered pattern. PBI alleged that NorFab's product amounted to unfair competition under the Lanham Act on the basis of their trademark. NorFab moved for summary judgment on the unfair competition claim, arguing that PBI had abandoned its interest in its mark from, at the very least, 2003 to 2007.

After identifying the relevant principles of abandonment, Chief Judge Bartle noted that PBI stopped advertising the at-issue pattern "in or before 2003." Id. at 728. Since PBI had not identified any other use of that specific pattern since 2003, despite asserting that it never intended to abandon the mark, the court applied the three-year presumption of abandonment. Id. at 729. The court initially rejected PBI's contention that its lawsuit against NorFab could be used as evidence of an intent to use the mark. Id. at 729 n.3. As PBI failed to show that "it has ever used the black checkered pattern for any purpose since 2003" and because there was no evidence of an "intent to resume its use," Chief Judge Bartle held that PBI "failed to dispel the presumption that it abandoned its rights in the design." Id. at 729.

While acknowledging that the court applies the statutory presumption in PBI, there are three important points that can be taken from Chief Judge Bartle's opinion. The first is that, in

-68-

spite of the fact that PBI insisted that it never intended to abandon the mark, the court still concluded that abandonment occurred.  Second, the court's opinion makes an important distinction between acts taken with the intent to protect rights to the mark and acts taken with the intent to make commercial use of the mark.  "The filing of a lawsuit . . . is only an indication that the plaintiff intends to protect its rights to the trademark, not that the plaintiff intends to resume use of the mark."  PBI, 514 F. Supp. 2d at 729 n.3 (emphasis in original).  Finally, abandonment occurred for PBI's mark after only four years of nonuse.

As discussed below, the evidence offered by Spurlock, and which Plaintiffs fail to rebut, indicates that there was no commercial use of the Famous Monsters mark between 1983 and when Spurlock published the book.  Plaintiffs are only able to point to Harris's registration of the trademark in 1991, which is not even a "commercial use" of the mark.  This period of nonuse is significantly longer than the time that Chief Judge Bartle found sufficient to establish abandonment.

Though the ITC case discussed earlier was also decided in the context of the statutory presumption of abandonment, its analysis is instructive here as well.  The ITC analysis again indicates that courts should not accept a mark owner's blanket assertions regarding abandonment.  Instead, courts must scrutinize the parties' assertions and identify genuinely supportive evidence.  The evidence offered by Warren to rebut Spurlock's evidence, particularly the coffee-table plans, are not genuine and substantial enough to meet the relevant standard on abandonment.

As to the evidence offered by Plaintiffs, though customer association of the Famous Monsters mark with Warren may have some relevance, such evidence does not address the abandonment test and does not rebut the evidence that Spurlock has offered here establishing

-69-

Plaintiffs' abandonment of the mark. As this Court noted in the section concerning the fourth fair use factor for the copyright claim, Warren took no substantial action in pursuit of his hypothetical coffee-table book prior to the initiation of this litigation. See ITC, 482 F.3d at 152-53 (rejecting the plaintiff's contention that intent to resume use was established by evidence of business proposals where there was no evidence that plaintiffs had taken a significant step in furtherance or given serious consideration to them). In addition, though Warren engaged in a dispute with authors who used a few covers of the magazine in their book and with Harris over the ownership to the Famous Monsters mark, this too is of limited relevance to the abandonment inquiry. "A lawsuit does not substitute for the required use of the mark in the marketplace." PBI, 514 F. Supp. 2d at 729 n.3; see also McCarthy on Trademarks § 17:11, at 17-21 ("Ordinarily, a lawsuit against an infringing user is not a sufficient excuse for failure to use a mark. A lawsuit does not substitute for the required use of the mark in the marketplace.").

Plaintiffs next insist that Harris's purchase of Warren Communications in 1983 for a substantial sum constitutes "bona fide use of such mark made in the ordinary course of trade." However, the evidence on the record suggests that Harris never used the Famous Monsters mark in trade, only that Harris purchased the rights to it over 25 years ago. This also says nothing about the use after the 1983 purchase. Finally, Plaintiffs rely on Warren's sporadic attendance at trade conventions to peddle some of his personal Famous Monsters memorabilia and back issues of the magazine. As discussed above, this "nominal or residual use" is "not sufficient to avoid abandonment." Kusek, 894 F. Supp. at 533.

This Court can not conclude, even taking the evidence in the light most favorable to Plaintiffs, that Warren's occasional attendance at trade conventions, along with the other

-70-

activities summarized above, over a period of 25 years, constitutes an "ongoing program to exploit" the Famous Monsters mark. Id. The uncontroverted evidence offered by Spurlock shows that Warren's use of the Famous Monsters mark "has been discontinued." 15 U.S.C. § 1127.

The same can be said of Warren's intent. Though Warren asserts that he never intended to abandon the mark,

> [i]n every contested abandonment case, the respondent denies an intention to abandon its mark; otherwise there would be no contest. Under Fed. R. Civ. P. 56, . . . one must, however, proffer more than conclusory testimony or affidavits. . . . As this court has frequently said in connection with motions for summary judgment, a conclusory statement on the ultimate issue does not create a genuine issue of fact. The [respondent] must put forth evidence with respect to what activities it engaged in during the nonuse period or what outside events occurred from which an intent to resume use during the nonuse period may reasonably be inferred.

Imperial Tobacco Ltd., Assignee of Imperial Group PLC v. Philip Morris, Inc., 899 F.2d 1575, 1581 (Fed. Cir. 1990) (internal citations omitted). Spurlock has offered compelling evidence that Warren acted "with intent not to resume such use" of the Famous Monsters mark. 15 U.S.C. § 1127. In response, Plaintiffs again failed to offer any evidence that adequately rebuts Spurlock's, other than Warren's unsupported testimony. Therefore, as "[i]ntent not to resume may be inferred from circumstances," § 1127, this Court finds that Warren intended to not resume use of the Famous Monsters mark.

As Plaintiffs have failed to rebut Spurlock's production with sufficient evidence to create a genuine issue of material fact on abandonment, this Court concludes that Plaintiffs have abandoned their right to the Famous Monsters mark.

## 6.    Unfair Competition Claim on the Basis of Abandoned Mark

In their response to Spurlock's abandonment contentions, Plaintiffs contend that

abandonment is not an obstacle to their claim and rely on a district court opinion in Peter Luger,

Inc. v. Silver Star Meats, Inc., 2002 WL 1870066 (W.D. Pa. May 17, 2002) (Cindrich, J.).[32]  In

Luger, the court considered a motion for a preliminary injunction on a dispute over brands of deli

meats.  A company based primarily in western Pennsylvania ("Luger-PA") operated a deli meats

business.  The company was so successful that the public associated the Luger name with high

quality products.  In 1994, a nationwide deli company, Hatfield, purchased Luger-PA, including

the rights to use the Luger brand.  However, only a year later, another company with the name of

Luger based out of New York ("Luger-NY") brought a trademark infringement action against

Hatfield for use of the Luger brand.  Hatfield and Luger-NY eventually settled the suit, with

Hatfield agreeing to not use the Luger brand and to instead market the deli meats under a new

brand name.

In 2001, a member of the Luger family, who used to work for Luger-PA, entered into an

agreement with a third-party deli meats distributor to sell a new brand of deli meats with the

name "R. Luger Classics."  Upon the new brand's entry into the marketplace, there was evidence

of significant confusion among customers as to whether the new R. Luger Classics brand was

owned by Hatfield, and Hatfield suffered significant losses in its own line of deli meats as a

result.  Hatfield subsequently brought suit for trademark infringement and unfair competition.

On the motion for a preliminary injunction, the court considered whether Hatfield had

---

[32] Plaintiffs also rely on the Restatement for the proposition that abandonment is no
obstacle to their claim, but the only case cited by Plaintiffs that accepts such an argument in
considering the Lanham Act, and not the Restatement, is Luger.

abandoned its right to the Luger mark.  First, the court held that "Hatfield did not abandon its

status as the successor-in-interest to the goodwill of Luger-PA and its well-known product line.

To the contrary, Hatfield undertook reasonable efforts to transition the residual goodwill from

Luger-PA to its own brand."  2002 WL 1870066, at *15.  However, the court held in the

alternative that injunctive relief was warranted, "even if defendants succeed on their

abandonment defense, in order to prevent confusion caused by the residual association of the

Luger-PA name and trade dress with its former user, Hatfield."  Id.  The court went on to identify

several cases concerning a family member's use of the surname in spite of the family company's

use of the mark.  In particular, the court quoted Gamlen Chemical Co. v. Gamlen, 79 F. Supp.

622, 635 (W.D. Pa. 1948):

> A person in the employment of another individual cannot withdraw
> from said employment and proceed to sell the same product, using
> his own surname which is similar to that of his former employer,
> and simulating the former employer's labels, advertisements and
> trade circulars where the intent to deceive the public exists.  Where
> such circumstances exist, regardless of fraudulent intent, the
> former employee cannot use his own name.

Luger, 2002 WL 1870066, at *15.  For these reasons, the court granted injunctive relief against

the defendant family member.  Id.

Though certain quotes of the district court's opinion in Luger may seem to support

Plaintiffs' suggestion, that use of an abandoned mark can still be challenged, the rationale of the

Luger decision is not applicable here.  The Luger mark in that case was a valuable commodity for

which Hatfield paid a significant amount.  Though Hatfield was forced to stop its use of the

mark, it continued to utilize the goodwill of "Luger" by slowly moving its customers to other

brand names.  Hatfield did not totally cease its business activities and its exploitation of the

market, as Warren did here. Rather, Hatfield continued using the goodwill of the Luger mark and switching the Luger customers over to the Hatfield brand. In addition, the district court's opinion was substantially based on the fact that the employee was part of the family that originally owned the trademark, which is not the case with Famous Monsters. Finally, it is also important to note that the district court's conclusion on use of an abandoned mark was made in the alternative, after concluding that it was unlikely that the defendant would succeed in making the abandonment argument. Though there were certainly strong justifications in Luger for the district court's holdings, those justifications do not appear in the record at hand, and the Luger holding relied on by Plaintiffs will not be applied in this case.

As McCarthy notes at the beginning of the discussion on abandonment, "[o]nce held abandoned, a mark falls into the public domain and is free for all to use. While acquiescence may bar suit against one person, abandonment opens rights to the whole world." McCarthy on Trademarks § 17:1; see also ITC, 482 F.3d at 147 ("Once abandoned, a mark returns to the public domain and may, in principle, be appropriated for use by other actors in the marketplace in accordance with the basic rules of trademark priority." (internal citations omitted)); Consol. Home Specialities Co. v. Plotkin, 55 A.2d 404, 412 (Pa. 1947) (recognizing abandonment as defense to unfair competition claim). Plaintiffs have not offered any other caselaw in support of their argument.

In conclusion, Spurlock's motion for summary judgment on the unfair competition claim will be granted.

**V.    Plaintiffs' Motion for Sanctions**

Finally, in their Motion for Partial Summary Judgment, Plaintiffs also moved for

-74-

sanctions against Spurlock for improperly denying a request for admission that is later to be proven true, pursuant to Federal Rule of Civil Procedure 37(c)(2). Plaintiffs claim that Spurlock "had no basis under the Federal Rules to refuse admitting to the fact that the images at issue from the Famous Monster Movie Art of Basil Gogos book were copies of the covers and commissioned paintings from the Warren magazines."

The Requests for Admission at issue all concerned illustrations in the Gogos Book that consisted of the Gogos artwork without the magazine text and overlay—in essence, the original artwork. The Requests sought admissions from Spurlock that: "the illustration shown on the bottom portion of page [] of the softcover edition of the book Famous Monster Movie Art of Basil Gogos is a copy of the cover of Famous Monsters of Filmland No. []." In his responses to the requests for admission, Spurlock carefully distinguishes between those illustrations in the Gogos book that appear with the Famous Monsters overlay, and those images that are reproductions of Gogos' artwork without the Famous Monsters text. Regarding those illustrations with the overlay, Spurlock admits that: "the illustration shown . . . is a reproduction of the original artwork of Basil Gogos, originally reproduced by permission of the artist, for a single use on the cover of Famous Monsters . . . ." As to those illustrations that appear in the Gogos Book without the Famous Monsters overlay, Spurlock denies the request for admission, stating instead: "The work appearing on page [] of the softcover edition of the book . . . is an original work of Basil Gogos, not reproduced from Famous Monsters of Filmland No. []." Plaintiffs claim that Spurlock's literal interpretation of the Requests for Admission, and "contorted responses" were "an attempt to thwart the very purpose of Rule 36 requests for admissions . . . ."

Rule 36 Requests for Admission are intended "to narrow the issues for trial to those which are genuinely contested." United Coal Companies v. Powell Const. Co., 839 F.2d 958, 967 (3d Cir. 1988). The Rule states that answers must respond to the substance of the matter, specifically admitting or denying its truth. Fed. R. Civ. P. 36 (a)(4). "[W]hen good faith requires that a party qualify an answer or deny only part of a matter, the answer must specify the part admitted and qualify or deny the rest." Id.

In light of the earlier discussion concerning ownership of the underlying Gogos artwork used for the magazine covers, this Court will deny Plaintiffs' motion for sanctions. For purposes of copyright ownership, there is an important difference between the illustrations in the Gogos Book that copy the magazine covers, as opposed to the illustrations that copy the Gogos artwork that Warren used for his magazine covers. This Court can not fault Spurlock for protecting his rights by drawing such a distinction in responding to the requests for admissions, and Plaintiffs' motion will therefore be denied.

## VI.   Motions Concerning the Experts

As this Court is granting summary judgment for Defendant on all of Plaintiffs' claims, the motions concerning the expert opinions will be denied as moot.

O:\CIVIL 07-08\08-3399 Warren v. Spurlock\Warren v. Spurlock - Memo MSJ.wpd

2:08-cv-03399-MMB

CHRISTOPHER D. OLSZYK                                    215-981-4750
PEPPER HAMILTON LLP                                      olszykc@pepperlaw.com
3000 TWO LOGAN SQUARE
18TH & ARCH STREETS
PHILADELPHIA PA 19109-2077

2:08-cv-03399-MMB

DOUGLAS   PANZER
CAESAR, RIVISE, BERNSTTEIN, COHEN & POKOTILOW, LTD     dpanzer@crbcp.com
1635 MARKET STREET
11TH FLOOR
PHILA  PA  19103-2212

2:08-cv-03399-MMB

M. KELLY TILLERY
PEPPER HAMILTON LLP                                    tilleryk@pepperlaw.com
3000 TWO LOGAN SQUARE
18TH AND ARCH STREETS
PHILADELPHIA PA 19103-2799

2:08-cv-03399-MMB

MANNY D. POKOTILOW
CAESAR RIVISE BERNSTEIN COHEN & POKOTILOW LTD
SEVEN PENN CTR 12TH FL
1635 MARKET ST
PHILADELPHIA PA 19103-2212

215-751-1142
mpokotilow@crbcp.com

— — —  —  —  — .          — — — —  —  —

2:08-cv-03399-MMB

SALVATORE R. GUERRIERO
CAESAR RIVISE, ET AL.                                    SGUERRIERO@CRBCP.COM
1635 MARKET ST
SEVEN PENN CTR 11TH FL
PHILA PA 19103