**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WARREN PUBLISHING COMPANY and | : | |
| JAMES WARREN, | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | No. 08-3399 |
| J. DAVID SPURLOCK d/b/a | : | |
| VANGUARD PRODUCTIONS, | : | |
| Defendant. | : | |

**MEMORANDUM RE:  DEFENDANT'S MOTION FOR ATTORNEY FEES**

**Baylson, J.**                                                                                    **March 3,  2010**

**I.        Introduction**

Plaintiffs James Warren and the Warren Publishing Company, of which James Warren is

president and sole shareholder (collectively, "Plaintiffs"), commenced this copyright

infringement action against Defendant J. David Spurlock, sole proprietor of publishing company

Vanguard Productions.  On August 4, 2009, the Court granted summary judgment in favor of

Spurlock on the basis of fair use.  Warren Publ'g Co. v. Spurlock, 645 F. Supp. 2d 402, 405

(E.D. Pa. 2009).  Presently pending before the Court is Spurlock's Motion for Attorney's fees

Pursuant to 17 U.S.C. § 505.  (Docket No. 80.)  For the reasons that follow, the Court will grant

in part and deny in part the Motion, entitling Spurlock to a partial award of attorney's fees.

**II.       Factual and Procedural Background**

The Court's Memorandum and Order granting Spurlock summary judgment detailed the

facts and procedural background relating to the underlying action.  See 645 F. Supp. 2d at 405-

10.  The background relevant to the pending Motion is briefly summarized below.

Beginning in 1958, Plaintiffs printed and published several magazines and comic books in the horror and monster film genre, including Famous Monsters of Filmland ("Famous Monsters"), Creepy, and Eerie, and commissioned several artists, including Basil Gogos ("Gogos") to design cover art for the magazines. Id. at 405-06. In 2006, Spurlock began selling a book entitled "Famous Monster Movie Art of Basil Gogos" ("Gogos Book"), which provided a career retrospective of Gogos, and included fourteen reproductions of original Gogos art used by Plaintiffs as background illustrations for their magazines, and ten exact reproductions of Plaintiffs' magazine covers that used Gogos's art and added text. Id.

On July 21, 2009, Plaintiffs commenced this action. (Docket No. 1.) Plaintiffs' Amended Complaint brought twenty-four copyright infringement claims pursuant to the Copyright Act of 1909, 17 U.S.C. §§ 1 et seq., and a Pennsylvania state law claim of unfair competition, alleging, inter alia, that the Gogos Book's title and copied images from, misappropriated the goodwill and valuable recognition developed by, and improperly suggested to consumers that the book is related to or endorsed by, Plaintiffs' Famous Monsters magazine. (Docket No. 29.) Spurlock's primary defense was that even assuming that Plaintiffs established a prima facie case of copyright infringement, the illustrations in the Gogos Book are entitled to the defense of fair use. Spurlock filed a Motion for Summary Judgment on all of Plaintiffs' claims. (Docket No. 51.)

On August 4, 2009, the Court granted summary judgment in favor of Spurlock.[1] Warren,

---

[1] The Court's Memorandum and Order also denied Plaintiffs' Motion for Partial Summary Judgment, because a genuine issue of material fact existed respecting the ownership of Gogos's artwork, and, in any event, "this issue [wa]s mooted by Spurlock's reliance on the fair use defense." 645 F. Supp. 2d at 414. The Court also denied Plaintiffs' Motion for Sanctions due to the dispute respecting ownership of the Gogos art. Id. at 445-46.

645 F. Supp. 2d at 405.   With respect to Spurlock's affirmative defense of fair use, the Court

concluded that the factors provided by 17 U.S.C. § 107, "considered as a whole, weigh in favor

of Spurlock," in large part because "the Gogos Book is inherently biographical," "render[ing] it .

. . fundamentally transformative in nature." Id. at 428.   The Court determined that this was

"coupled with the fact that Spurlock utilized such a quantitatively and qualitatively minor portion

of the magazines." Id. at 428.   Accordingly, the Court dismissed Plaintiffs' copyright

infringement claims.  Id.  The Court also concluded that Plaintiffs "abandoned their right to the

Famous Monsters mark," and thus dismissed the unfair competition claim.  Id. at 443.

On August 19, 2009, Spurlock filed the pending Motion for Attorney's Fees Pursuant to

17 U.S.C. § 505, requesting a total of $322,502.76[2]—$280,479.39 in attorney's fees and

$42,023.27 in expenses.  (Docket No. 80, at 29.)  The Court heard oral argument on the Motion

on February 5, 2010.  (Docket No. 91.)

## III.    Legal Standard

Because the parties disagree as to the legal standard respecting attorney's fees, and in

particular, how frequently such fees are awarded to prevailing defendants in fair use copyright

infringement cases, the Court will detail the parties' contentions, before articulating the

governing standard.

### A.       The Parties' Contentions

Spurlock contends that unlike patent or trademark cases, in which attorney's fees are

awarded only in "exceptional cases," courts "routinely" exercise their discretion to grant

---

[2]Spurlock's Motion requests a total of $322,502.64, which appears to be a typographical error.

attorney's fees to the prevailing party in copyright infringement cases and do not require a showing of bad faith.  (Att'y Fees Mot. 2-3.)  Spurlock urges the Court to "fairly . . . constru[e]" an award of attorney's fees "as the rule, rather than the exception," as circuits other than the Third Circuits have purportedly recognized.  (Reply 2.)

Plaintiffs, however, contend that "an award of attorney's fees" to a prevailing defendant "is neither the rule nor presumed" (Resp. 7 n.7), and that courts frequently "den[y] motions for attorney's fees to defendants [who] prevailed on fair use" because "fair use cases typically involve close and complex questions of fact and law," (Resp. 8 n.8, 11).

### B.    Analysis

The Copyright Act provides that "the court in its discretion may . . . . award a reasonable attorney's fee to the prevailing party as part of the costs."  17 U.S.C. § 505.  In Fogerty v. Fantasy, 510 U.S. 517, 536 (1994), the Supreme Court directed courts to look to the following list of  "nonexclusive factors that courts should consider in making awards of attorney's fees" which the Third Circuit enunciated in Lieb v. Topstone Industries, Inc., 788 F.2d 151, 156 (3d Cir. 1986):  "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."  Fogerty, 510 U.S. at 535 n.19.  Fogerty explained that "such factors may be used to guide courts' discretion, so long as such factors are faithful to the purposes of the Copyright Act and are applied to prevailing plaintiffs and defendants in an evenhanded manner."  Id. at 535 n. 19.  In adopting the "evenhanded" approach, the Fogerty Court rejected the "dual approach" of requiring a prevailing defendant to show either bad faith or frivolousness as "too narrow a view of the purposes of the Copyright Act because it fails to

adequately consider the important role played by copyright defendants." Id. at 532 n. 18.

Fogerty determined that awarding attorney's fees to defendants met the purposes of the

Copyright Act, which the Court summarized as follows:

> "[T]he primary objective of copyright is not to reward the labor of authors, but '[t]o promote the Progress of Science and useful Arts.' To this end, copyright assures authors the right to promote original expression, but encourages others to build freely upon the ideas and information conveyed by a work."

Id. at 527 (quoting Feist Pubs., Inc. v. Rural Telephone Serv. Co., 499 U.S. 340, 349-50 (1991)).

In rejecting the argument that discouraging infringement is the "only goal" of the Copyright Act,

Fogerty stated that

> [b]ecause copyright law ultimately serves the purpose of enriching the general public through access to creative works, it is peculiarly important that the boundaries of copyright law be demarcated as clearly as possible. To that end, defendants who seek to advance a variety of meritorious copyright defenses should be encouraged to litigate them to the same extent that plaintiffs are encouraged to litigate meritorious claims of infringement. . . . Thus a successful defense of a copyright infringement action may further the policies of the Copyright Act every bit as much as a successful prosecution of an infringement claim by the holder of a copyright.

Id.

Spurlock, thus, need not establish either bad faith on the part of Plaintiffs, see Lieb, 788

F.2d at 156, or "exceptional" circumstances in order to be awarded attorney's fees in this

copyright infringement action.[3] In fact, post-Fogerty, courts have increasingly awarded

attorney's fees to prevailing defendants. See Jeffrey Edwards Barnes, Comment, Attorney Fee

Awards in Federal Copyright Litigation After Fogerty v. Fantasy: Defendants Are Winning Fees

---

[3]See Securacomm Consulting, Inc. v. Securacom Inc., 224 F.3d 273, 281-82 (3d Cir. 2000) (acknowledging that the "exceptional" circumstances requirement in patent and trademark actions does not apply in copyright cases); cf. 15 U.S.C. § 275 (permitting awards of "reasonable fees to the prevailing party" in "exceptional" trademark infringement cases); 35 U.S.C. § 285 (same for patent infringement cases).

<u>More Often, But the New Standard Still Favors Prevailing Plaintiffs</u>, 47 UCLA L. Rev. 1381,

1390 (2000) (finding that "<u>Fogerty</u> has had a dramatic impact on the frequency that fee awards

are granted to prevailing defendants," and that defendant's motions for fees "ballooned" from 16

percent prior to the decision to 61 percent after the decision was issued).

Nonetheless, given that the Court must conduct a case-by-case analysis—guided by

factors including those enunciated in <u>Lieb</u>, and the Copyright Act's underlying goals—to

determine whether attorney's fees are appropriate, the Court agrees with Plaintiffs that attorney's

fees awards for prevailing plaintiffs are by no means "the rule []or presumed" (Resp. 7 n. 7.).

This is especially true when a defendant prevails on the basis of the fair use defense, as here,

because the defense cannot be resolved by "bright-line rules, for the statute, like the doctrine it

recognizes calls for case-by-case analysis," which requires consideration of the four factors listed

in section 107 of the Copyright Act,[4] as well as "the purposes of copyright." <u>Campbell v. Acuff-</u>

<u>Rose Music, Inc.</u>, 510 U.S. 569, 577-78 (1994).

The Court finds instructive <u>Williamson v. Pearson Educ., Inc.</u>, 60 U.S.P.Q. 2d. 1723

(BNA) (S.D.N.Y. 2001), and <u>Leibovitz v. Paramount Pictures Corp.</u>, 55 U.S.P.Q. 2d 1598

(BNA) (S.D.N.Y. 2000), two cases denying attorney's fees to defendants who had prevailed at

---

[4]The four statutory fair use factors are as follows:

(1) the purpose and character of the use, including whether such use is of a
commercial nature or is for nonprofit educational purposes;
(2) the nature of the copyrighted work;
(3) the amount and substantiality of the portion used in relation to the copyrighted
work as a whole; and
(4) the effect of the use upon the potential market for or value of the copyrighted
work.

17 U.S.C. § 107.

the summary judgment stage on the basis of fair use. <u>Williamson</u> summarily denied the defendants attorney's fees because the plaintiff's claims "were neither frivolous nor objectively unreasonable," 60 U.S.P.Q. 2d at 1732, and <u>Leibovitz</u> because the plaintiff's copyright infringement action was not objectively unreasonable and in light of the "then-relatively new state of fair use law," 55 U.S.P.Q. 2d at 1601. In <u>Williamson</u> and <u>Leibovitz</u>, as in this case, the courts determined that fair use existed, in large part because the defendant's work was "fundamentally transformative in nature," <u>Warren</u>, 645 F. Supp. 2d at 428. <u>See</u> <u>Williamson</u>, 60 U.S.P.Q. 2d at 1727; <u>Leibovitz</u>, 55 U.S.P.Q. 2d at 1600. Both cases, however, denied attorney's fees even though three of the four fair use factors favored the defendant and the fourth factor only slightly disfavored the defendants, <u>Williamson</u>, 60 U.S.P.Q. 2d at 1727-28; <u>Leibovitz</u>, 55 U.S.P.Q. at 1600-01.[5] In light of <u>Williamson</u> and <u>Leibovitz</u>, which did not award attorney's fees to prevailing defendants who had stronger fair use defenses than the present case, in which only two of the factors favored Spurlock, 645 F. Supp. at 428, the Court will not presume that Spurlock is entitled to attorney's fees. On the other hand, the Court remains mindful that numerous courts have awarded attorney's fees to prevailing defendants in cases involving fair

---

[5]A contrary result is not warranted by <u>Mattel, Inc. v. Walking Mountain Prods.</u>, No. 99-8543, 2004 WL 1454100, at *1 (C.D. Cal. June 21, 2004), upon which Spurlock relies for the proposition that prevailing defendants are routinely awarded attorney's fees, because although that case involved fair use, the defense was "raised in defense of parody" and "[t]he parodic character of Defendant's work was clear." The Court also declines to consider <u>Hustler Magazine Inc. v. Moral Majority Inc.</u>, 796 F.2d 1148 (9th Cir. 1986) and <u>Belmore v. City Pages, Inc.</u>, 880 F. Supp. 673 (D. Minn. 1995), upon which Plaintiffs rely for their contention that courts frequently deny attorney's fees to prevailing defendants, because those decisions were issued prior to, or did not apply, respectively, the Supreme Court's pronouncement in <u>Fogerty</u>.

use.[6]  The Third Circuit has not yet ruled on this issue, nor has any judge of this Court in recent years.

In order to carry out its duty to conduct a case-specific analysis of whether attorney's fees are warranted, the Court will now examine how the Lieb factors apply to the case at hand.

## IV.  Discussion

The Court will address in turn each of the Lieb factors affecting whether an attorney's fee award is appropriate:  (1) frivolousness and "objective unreasonableness (both in the factual and in the legal components of the case)," (2) Plaintiffs' motivation, and (3) "the need in particular circumstances to advance considerations of compensation and deterrence."  Fogerty, 510 U.S. at 535 n. 19 (citing Lieb, 788 F.2d at 156).

### A.    Frivolousness and Objective Unreasonableness

Frivolousness is defined as "lacking any plausible merit," Matthew Bender & Co.  v. West Publ'g Co., 240 F.3d 116, 126 (2d Cir. 2001), "either in law or in fact," Neitzke v. Williams, 490 U.S. 319, 325 (1989).  As for objective unreasonableness, courts including the Second Circuit have "accorded substantial weight" to the factor, which is "derive[d] from the Supreme Court's admonition in Fogerty that an award of attorneys' fees must comport with the purposes of the Copyright Act," that being that "parties who advance" "litigation positions [that]

_____

[6]See, e.g., Tavory v. NTP, Inc., 297 Fed. App'x 986 (Fed. Cir. 2008); Compaq Computer Corp. v. Ergonome Inc., 387 F.3d 403 (5th Cir. 2005); Bond v. Blum, 317 F.3d 385 (4th Cir. 2003); Hofheinz v. AMC Prods., Inc., No. 00-5827, 2003 U.S. Dist. LEXIS 16940 (E.D.N.Y. Sept. 1, 2003); Video-Cinema Films, Inc. v. Cable News Network, Inc., Nos. 98-7128, 98-7129, 98-7130, 2003 WL 1701904 (S.D.N.Y. Mar. 31, 2003); Religious Tech. Ctr. v. Lerma, 908 F. Supp. 1362 (E.D. Va. 1995).  The last case cited by Spurlock as an example of an attorney's fee award to a prevailing fair use defendant, Diamond v. Am-Law Publ'g Corp., 745 F.2d 142 (2d Cir. 1984), will not be considered, because it was decided prior to, and thus, was abrogated by, Fogerty.

define the precise boundaries of copyright law . . . should not be punished by the imposition of fees." Schiffer Books Publ'g, Ltd. v. Chronicle Books, LLC, 76 U.S.P.Q. 2d 1493, 1497 (E.D. Pa. 2005) (Schiller, J.)

Spurlock urges the Court to award him attorney's fees, contending that even though "Fair Use may be a difficult concept in the abstract," this case involved "nothing novel, complex or close." (Reply Br. 9.) Spurlock's counsel then conceded at oral argument that "to be candid with your Honor," he does "not think so strongly that [Plaintiffs' claim] is frivolous." (Oral Arg. 20:7-42, Docket No. 91 (audio file).) Nonetheless, Spurlock avers that Plaintiffs took the following several "factual and legal positions . . . both before and especially during the litigation," that were frivolous and objectively unreasonable: (1) asserting a "baseless" punitive damages claim, (2) replacing that claim with a "disingenuous" Unfair Competition claim, (3) filing suit despite only having phantom ownership of the copyrights being asserted, (4) submitting "half-truths and untruths" to the Court, (5) making largely unsupported arguments that the fair use doctrine does not apply, (6) "stubbornly" resisting all of Spurlock's settlement efforts, and (7) engaging in "needless" and "excessive" motions practice and litigation tactics. (Att'y Fees Mot. 11-23.) The Court will examine each of these contentions, and Plaintiffs' responses thereto, in turn.

### 1.    Punitive Damages Claim

Spurlock begins by contending that Plaintiffs' Complaint included a punitive damages claim that was "baseless" because "there are no punitive damages in Copyright Law," and "only two dubious and criticized cases from the Southern District of New York" have suggested that such damages might be appropriate. (Att'y Fees Mot. 12, 12 n. 13 (emphasis omitted)). In

response, Plaintiffs aver that "while a minority position, there was authority that held that punitive damages may be available to a plaintiff who sues for copyright infringement when there is evidence of malice." (Resp. 35.) Plaintiffs also contend that they did not "persistently" pursue their claim, because they subsequently amended their pleading to seek punitive damages only under their Unfair Competition claim. (Resp. 34-35.)

"[I]t appears to be accepted that punitive damages are not recoverable in federal copyright suits." Hays v. SONY Corp. of Am., 847 F.2d 412, 415 (7th Cir. 1988); see also Oboler v. Goldin, 714 F.2d 211, 213 (2d Cir. 1983) ("[P]unitive damages are not available under the Copyright Act of 1976."); cf. Epcon Group, Inc. v. Danburry Farms, Inc., 28 Fed. App'x 127,, 130 (3d Cir. 2002) (non-precedential) (affirming as proper the district court's jury instruction stating that Plaintiffs could not recover punitive damages on their Copyright Act claim, notwithstanding a finding of liability). As for the two cases arguably permitting punitive damage awards, the first, Blanch v. Koons, 329 F. Supp. 2d 568, 569 (S.D.N.Y. 2004), recognized that "[c]onventional authority holds that punitive damages are unavailable in copyright infringement actions" and only permitted the Plaintiff to argue that the law does not require that result. Judge Stanton, however, subsequently rejected that decision, stating, "If it ever was, that decision is no longer good law. Recent decisions have rejected its holding." Viacom Int'l Inc. v. Youtube, Inc., 540 F. Supp. 2d 461, 463 (S.D.N.Y. 2008).

The second case, TVT Records v. Island Def Jam Music Group, 262 F. Supp. 2d 185, 187 (S.D.N.Y. 2003), concluded that "punitive damages claims for copyright infringement found to be willful are not precluded as a matter of law," in light of a softening stance under Second Circuit law. This conclusion was also rejected by Judge Stanton in 2003 in Viacom, 540 F.

Supp. 2d at 463-64.  As a result, by 2008, when Plaintiffs filed their Complaint, both of the cases upon which Plaintiffs relied, neither of which, even if still good law, would be binding on this Court, had been rejected, and no authority from the five years since that rejection supported Plaintiffs' position.  Although Plaintiffs' punitive damages claim may not have risen to the level of frivolousness, the Court finds that it is objectively unreasonable in law.

### 2.     Unfair Competition Claim

Spurlock contends that after Plaintiffs withdrew their meritless punitive damages claim, they filed an Amended Complaint that added a "disingenuous 'Unfair Competition' claim" under Pennsylvania law, as a "desperate attempt to rescue their floundering punitive damages claim." (Att'y Fees Mot. 12-13.)  Spurlock concludes that the Unfair Competition claim was frivolous or objectively unreasonable, because Plaintiffs "failed to rebut" Spurlock's production of records from the United States Patent and Trademark Office showing that Plaintiffs lacked trademark rights to the works, that Plaintiffs' registrations had been cancelled, and that any common-law rights from the 1980's had been abandoned.  (Att'y Fees Mot. 13.)  According to Plaintiffs, they had a "sufficient factual and legal predicate" for believing that Spurlock's book "intended to exploit the positive and favorable associations" with their work, because Spurlock admitted he based the title of his book on Famous Monsters, and third parties demonstrated actual confusion as to the connection between the two works.  (Resp. 36.).  Plaintiffs contend that in any event, "[u]nder the 'American Rule,' an award of attorney's fees is not available to Defendant," because 17 U.S.C. § 505 does not specifically apply to their claim under Pennsylvania common law for Unfair Competition, as Defendant conceded in his Motion by not seeking recovery for litigation related to this claim.  (Resp. 35-36.)

11

Plaintiffs are correct that under "the general 'American Rule' . . . the prevailing parties may not recover attorneys' fees as costs or otherwise" unless there is an "applicable statutory authorization for such an award," Alyeska Pipeline Serv. Co. v. The Wilderness Soc'y, 421 U.S. 240, 245 (1975), and there does not appear to be any statutory authorization for attorney fee awards under Pennsylvania common law for Unfair Competition claims. Spurlock conceded that he "appreciates and is respectful that Title 17 U.S.C. § 505 does not specifically apply to Plaintiffs' Pennsylvania State Common Law claim for Unfair Competition," and "only seeks fees associated with the Copyright claims." (Att'y Fees Mot. 24.) Accordingly, Spurlock cannot recover attorney's fees for litigation related to this claim, regardless of the merit of the claim, and thus, the Court need not and will not analyze whether that claim was objectively unreasonable or frivolous.

### 3. Phantom Copyright Ownership

Spurlock then contends that Plaintiffs acted in an objectively unreasonable or frivolous manner by filing suit without first establishing that they owned their asserted copyrights; only later, did Spurlock discover that Plaintiffs did not own fifteen of the copyrights, and that ownership of the additional copyrights remained unclear. (Att'y Fees Mot. 13-14.) Spurlock further avers that rather than alerting the Court and Spurlock to these problems of ownership, Plaintiffs waited until their response to Spurlock's motion for summary judgment to "acknowledge[]" the issue. (Att'y Fees Mot. 14.) Plaintiffs respond that they acted in good faith, as evidenced by the fact that "within seven weeks after Defendant had filed his Answer, when it had become apparent to Plaintiffs" that they did not own the first fifteen copyrights, they "advised Defendant of their withdrawal of those claims." (Resp. 41.) Plaintiffs then explain that

they never filed a First Amended Complaint because the parties stipulated to omitting the claims respecting the fifteen copyrights that Plaintiffs did not own. (Resp. 42.) Plaintiffs submit that the conduct "far from demonstrates the kind of vexatious litigation that supports an award of attorney's fees." (Resp. 42.)

The Copyright Act provides that generally, "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title." 17 U.S.C. § 411(a). "Minor mistakes in a registration statement, made in good faith and unaccompanied by deceptive intent, will not serve to invalidate registration." Yurman Studio, Inc. v. Castenada, 591 F. Supp. 2d 471, 484 (S.D.N.Y. 2008).

The Court finds that Plaintiffs' initial assertion of fifteen copyrights that they in fact did not own does not rise to the level of objective unreasonableness, let alone frivolousness. In November 2008, in response to Spurlock's first set of interrogatories, Plaintiffs indicated that they only intended to assert copyrights for twenty-four works. (Pls.' Objections & Resps. to Def.'s 1st Set of Interrogatories 5, Resp. Ex. 4.) Courts have found that voluntary dismissal of copyright claims does not make the defendant a "prevailing party" for purposes of 17 U.S.C. § 505, and thus, entitled to attorney's fees under the Copyright Act. See, e.g., TRF Music Inc. v. Alan Lett Music Group LLC, No. 06-0349, 2006 WL 1376931 (S.D.N.Y. May 18, 2006); Phila. Stock Exch. v. Int'l Sec. Exch., No. 05-5390, 2005 WL 2923519 (S.D.N.Y. Nov. 2, 2005). As a result, Plaintiffs' claims for the fifteen works they later discovered that they did not own, which were subsequently withdrawn, do not support a finding of attorney's fees

### 4.     "Half-Truths and Untruths"

Next, Spurlock contends that he "was forced to defend against disingenuous claims based on Plaintiffs' lies and half-truths." (Att'y Fees Mot. 14.) According to Spurlock, Plaintiffs filed a "bogus request for Expedited Discovery . . . based solely on Mr. Warren's false/deceptive representation that he would be deaf within six months," and Warren made misleading statements during his deposition on December 3, 2008 as to substantive efforts he made to produce a Coffee Table Book similar to Spurlock's Gogos Book, when in fact he had not made such efforts and only sought out publishers after that deposition. (Att'y Fees Mot. 14-15, 15 n. 17.) In response, Plaintiffs contest Spurlock's first contention, instead asserting that they requested discovery out of a "genuine concern that Mr. Warren's hearing would deteriorate to the point where he would be unable to meaningfully participate at trial," and that "the worsening of Mr. Warren's hearing has become a reality." (Resp. 39.)

On September 15, 2008, Plaintiffs' counsel sent letters to the Court and to Spurlock's counsel "respectfully request[ing] an expedited discovery and trial schedule" on the basis that Warren

> suffers from a severe hearing injury incurred during the Korean War, which has caused Mr. Warren's hearing to become progressively worse, to a point where Mr. Warren is expected to be almost totally deaf within next [sic] six months. It goes without much explanation that such a condition will cause serious hardship to Mr. Warren, disadvantaging Plaintiffs in the instant matter.

(Att'y Fees Mot., Ex. 2.) Warren's hearing did not in fact deteriorate within the six months following the submission of the letters, although two of Plaintiffs' attorneys submitted declarations stating that within the past year, Warren's hearing has substantially declined such that he now has difficulty understanding speech. (Resp. Exs. 2-3.) On February 12, 2009, Warren testified at a deposition as follows:

14

Q:     Are you saying the audiologist told you that you would likely be deaf in six months?

A:     No.  She told me that my hearing has been–has decreased rapidly.  And I discussed with her how each month it gets worse.

Q:     Did the physician tell you that you would likely be deaf in six months?

A:     No.

Q:     Did anybody, any physician or any medical care provider, ever render that opinion in writing, that you were going to be deaf within six months?

A:     No.

Q:     Do you know upon what basis your lawyers made that representation to the Federal Court?

A:     Yes, I told them.  And I didn't say totally deaf.

       * * *

       No one told me that I was going to be totally deaf.

Q:     So what did your lawyers base this representation on, if anything?

A:     I told them that I programmed my own hearing over a period of a year and I know how it's disintegrating and I know how much more I need to use lip reading.

Q:     So this was based upon your judgment?

A:     It was based upon my judgment and the affirmation of my audiologist, hearing aid person, who told me that the hearing is getting worse, progressively.

(Warren Dep. 275:16–276:13, 277:6-24, Feb. 3, 2009.)  Warren's testimony reveals that the

representations by Plaintiffs' counsel that he "is expected to be almost totally deaf" within six

months (Att'y Fees Mot., Ex. 2.), was not based on any medical diagnosis, aside from a general

diagnosis that his hearing was deteriorating; rather, counsel's representation was only supported

by Warren's self-serving self-diagnosis.

       In addition, it appears that even if Warren's hearing rapidly deteriorated during those six

months, accommodations could have been made to enable him to meaningfully participate in the

litigation. As Plaintiffs' attorney conceded in his Declaration appended to Plaintiffs' Response to Spurlock's Motion for Attorney's Fees, after submitting his request for an expedited discovery and trial schedule, he "realized" and confirmed with the Court's deputy clerk and court reporting service that he could use a court stenographer "for transcribing questions and answers in real time, with a monitor placed in front of Mr. Warren while at counsel's table and on the witness stand, [which] would enable him to follow the trial and enable him to answer questions asked of him at trial." (Resp. Ex. 2.) The Court, therefore, concludes that Plaintiffs' request for expedited proceedings, although not of major consequence in this case, was objectively unreasonable in fact, which weighs slightly in favor of awarding attorney's fees.

Turning to Warren's purported misrepresentation that he pitched a book similar to the Gogos Book, when in fact he only did so after making that statement, the Court already previously reviewed the evidence on the record and "agree[d] with Spurlock that Warren exhibited little genuine interest in actually publishing [a] coffee table book, up until the point when this litigation commenced. Only after the litigation began did he take any substantial steps toward considering publication of the book." Warren, 645 F. Supp. 2d at 425. Plaintiff's counsel conceded as much, stating in a response to Spurlock's discovery requests that Warren "ha[d] not had conversations with any publishers other than a preliminary exchange" with one published. (Att'y Fee Mot. Ex. J, at 3.) As with Plaintiffs' assertions as to Warren's impending deafness, Warren's testimony that he made substantial efforts to produce a book similar to Spurlock's is belied by the record, and therefore, objectively unreasonable in fact.

### 5. Fair Use Arguments

According to Spurlock, several of the arguments Plaintiffs asserted as reasons why the

fair use doctrine does not apply to the Gogos Book were objectively unreasonable or frivolous. For the first factor of "the purpose and character of the use," 17 U.S.C. § 107(1), Spurlock contends that Plaintiffs' "vigorously" asserted that the Gogos Book "was not a biography, was not transformative, and was not a Fair Use," was "unreasonabl[e]" (Att'y Fees Mot. 16), as evidenced by this Court's determinations "[t]hat Spurlock's book fits 'comfortably within' the statutory categories," that Plaintiffs' argument that the purportedly misleading nature of the Gogos book title satisfies the fair use commercialism inquiry was not supported by case law, and thus, that the Gogos Book had a transformative use, Warren, 645 F. Supp. 2d at 419. As for Plaintiffs' arguments as to the amount and substantiality taken from the magazine covers, the third fair use factor, Spurlock avers that the Court rejected each as unsupported by case law. (Att'y Fees Mot. 17-18.)

Plaintiffs contest the characterization of their arguments as unsupported, averring instead that several cases have indicated that biographies can and do infringe, especially, as in the case of Spurlock's book, when the book "shows that each of the reproductions was employed in the same manner and for the same aesthetic expressive purpose as the magazine covers and commissioned paintings at issue. The reproductions were exact, mechanical copies of the originals" with commentary that "is clearly subordinate and ancillary to the reproductions, which are large individual images and the main focal points of each page." (Resp. 22-23.) As for bad faith, Plaintiffs reassert that the Supreme Court only stated "by way of dictum" that requesting and being denied permission to use a plaintiff's work could not, "in itself," be used to show a defendant's bad faith, and that Spurlock "intentional[ly] exploit[ed] the favorable associations" with Famous Monsters by giving his book a similar title. (Resp. 26-27.) For amount and

substantiality, Plaintiffs contend that they had a strong argument that Spurlock took the entirety of their works, because Plaintiffs owned a copyright in the collective whole, including the magazines' artwork. (Pls.' Resp. 28-34.) Plaintiffs thereby conclude that their arguments were by no means objectively unreasonable or frivolous.

As the Court already explained at oral argument, although it concluded that the fair use factors weighed in Spurlock's favor, this was by no means an "easy" case (Oral Arg. 17:25), and the Court's decision granting summary judgment reflects as much. Although the Court ultimately determined that Spurlock's book was a transformative biography, and rejected each of Plaintiffs' bad faith arguments, it also noted that "[t]here are some characteristics regarding Spurlock's use that do not support his claim of fair use," namely that Spurlock's book changed the format of Plaintiffs' work, which might seem to be merely "a new way to exploit the creative virtues of the original work," and reproduced "the covers and images . . . with little or no modification." Warren, 645 F. Supp. 2d at 418. In addition, "Spurlock admit[ted] to making a profit from the book," which to a degree supported Plaintiffs' argument that the book was "commercial" in nature and designed to exploit Plaintiffs' copyrighted works. Id. at 420.

The Court then concluded that the second factor, the "nature of the copyrighted work," 17 U.S.C. § 107(2), though being "of limited relevance because of the prior finding that Spurlock's work is transformative," "weighs slightly in favor of Plaintiffs," because, as "Spurlock concede[d,] the copyrighted magazine covers fall within the core of the Copyright Act's protective purposes since they are creative expressions." Id. at 422-23.

As for the third factor of the amount and substantiality taken from Plaintiffs' work, although under binding precedent, Spurlock took only a small quantity of Plaintiffs' work, 1 to

1.5%, the qualitative portion of the analysis was closer.  Id. at 424.  The Court concluded that

"the quality and importance of the covers as used in the original magazines are relatively minor,"

but Gogos's art still appeared on the cover of the <u>Famous Monsters</u> magazines, and the covers

were not changed greatly before being used in Spurlock's book, both of which reasonably

support Plaintiffs' argument that the covers were central and at "the heart" of the magazine's

content.  Id. at 425.

The Court then determined that the fourth factor, "the effect of the use upon the potential

market for or value of the copyrighted work," 17 U.S.C. § 107(4), "slightly favors Plaintiffs,

"based on Warren's own testimony and the supporting testimony from others," and the fact that

the Court had to make all factual references in Plaintiffs' favor on summary judgment, <u>Warren</u>,

645 U.S. at 428.  In sum, two of the four factors weighed in Plaintiffs' favor, and the Court,

despite finding that the Gogos Book constituted fair use, also found facts and arguments

supporting Plaintiffs' arguments.  The Court, therefore, concludes that Plaintiffs' fair use

positions, though at times unsupported, were not objectively unreasonable or frivolous.

### 6.    Rejection of Settlement Offers

Spurlock then faults Plaintiffs for stubbornly resisting all of his efforts "to reach an

amicable and cost effective resolution to the litigation," beginning before the litigation

commenced, when he notified Plaintiffs that he intended to use the Gogos artwork and that he

believed he could do so under the doctrine of fair use, but Plaintiffs waited until after two years

after the Gogos book was published before filing suit.  (Att'y Fees Mot. 20-21.)  Plaintiffs,

however, aver that their rejection of Spurlock's settlement efforts indicate no improper or

malicious purpose.  (Resp. 40.)

As a preliminary matter, the Court will address <u>infra</u> the extent to which Plaintiffs'
decision to wait years after the publication of the Gogos Book before filing suit, speaks to
Plaintiffs' motivations. Insofar as Plaintiffs' rejected Spurlock's settlement offers, such evidence
does not show objective unreasonableness or frivolousness on the part of Plaintiffs. As Judge
Schiller explained in <u>Schiffer</u>, in refusing to consider such evidence in relation to a request for
attorney's fees, "unwillingness to settle, or even to provide a concrete counteroffer to
Defendants' multiple settlement offers . . . . do[es] not constitute [a] bad faith attempt[] to harm a
competitor." 76 U.S.P.Q. 2d at 1496. Because the Court has already concluded that Plaintiffs'
fair use arguments and positions did not rise to the level of objective unreasonableness,
Plaintiffs' refusal to settle what were by no means entirely meritless copyright claims, was not
objectively unreasonable, let alone frivolous.

### 7.     Motions Practice and Litigation Tactics

Next, Spurlock avers that Plaintiffs made a series of objectively unreasonable litigation-
related decisions. According to Spurlock, Plaintiffs unreasonably refused to extend discovery
deadlines, and filed three successive motions to compel and a motion for sanctions without first
meeting and conferring with him as required by Local Rule of Civil Procedure 26.1. (Att'y Fees
Mot. 21-22.) In addition, Plaintiffs purportedly filed a frivolous summary judgment motion
which would have required the Court to find ownership in twenty-four works, even though this
raised questions of fact that are not proper for summary disposition, and added allegations that
Spurlock infringed on the copyrights for the underlying artwork, rather than just the magazines.
(Att'y Fees Mot. 22-23.) Lastly, Spurlock avers that Plaintiffs unreasonably requested
information regarding his assets in order to pursue their meritless punitive damages claim. (Att'y

Fees Mot. 23.)

Plaintiffs deny that any of their actions were unreasonable. Regarding their refusal to extend discovery, Plaintiffs contend that Spurlock already had over six months to complete reasonable discovery, and that at the summary judgment stage, Spurlock had also declined to grant an extension. (Resp. 46-47.) As for Spurlock's arguments respecting Local Rule 26.1, Plaintiffs argue that they only moved to compel production because they believed in good faith that efforts to resolve the dispute would have been futile, and in any event, they promptly withdrew their motions once Spurlock produced the requested documents, and for sanctions, they are not required to confer beforehand with the opposing party. (Resp. 44-45.) Plaintiffs then aver that their summary judgment motion was not improper, because they had prima facie evidence of ownership. (Resp. 47-50.) As for requesting Spurlock's financial information, Plaintiffs contend that such evidence is relevant information to claims for punitive damages. (Resp. 50-51.)

Bad faith litigation tactics, such as "us[ing] the Copyright Act to secure payment [for] fair use" of a plaintiff's products, Video-Cinema Films, Inc. v. Cable News Network, Inc., Nos. 98-7128, 98-7129, 98-7130, 2003 WL 1701904 (S.D.N.Y. Mar. 31, 2003), and "knowingly gambl[ing] on an unreasonable legal theory in order to achieve a secondary gain [such as] the leveraging of a settlement," Torah Soft Ltd. v. Drosnin, No. 00-5650, 2001 WL. 1506013, at *3 (S.D.N.Y. Nov. 27, 2001), are objectively unreasonable and weigh in favor of an attorney's fee award. The litigation tactics at issue here do not rise to this level.

For the first question as to Plaintiffs' refusal to extend discovery deadlines, Spurlock has failed to identify evidence in the record indicating that Plaintiffs' opposition to the extension

request was objectively unreasonable. The same is true of Plaintiffs' subsequent filing of motions to compel, for sanctions, and for summary judgment. Local Rule 26.1(f) requires "certification of counsel that the parties, after reasonable effort, are unable to resolve the dispute," E.D. Pa. Local R. 26.1(f), but it is far from clear that Plaintiffs did not have a basis for believing in good faith that Spurlock would comply with the discovery requests absent court intervention. As for sanctions, it is no defense that a moving party need not confer with the opposing party about the inadequacy of discovery answers, see House v. Giant of MD, LLC, 232 F.R.D. 257, 260 (E.D. Va. 2005), meaning that Plaintiffs' filing of a motion for sanctions before conferring with Spurlock, by itself, does not appear to be objectively unreasonable. Turning next to Plaintiffs' summary judgment motion, the Court found that summary judgment relief was precluded because there were "significant factual disputes . . . as to whether the Gogos artwork is entitled to work-for-hire status [and] what legal rights each party is entitled to if the artwork was a made-for-hire," 645 F. Supp. 2d at 412; nonetheless, the Court is not persuaded that Plaintiffs' motion for summary judgment, merely because it raised issues of fact and law that the Court ultimately found to be genuine and disputed, was objectively unreasonable.

Finally, with respect to the request for Spurlock's financial information, as already discussed, Plaintiffs' underlying punitive damages claim was without legal merit, given the unavailability of such relief for copyright actions; however, a "defendant['s] financial condition is relevant" once "plaintiffs have stated a claim for punitive damages, and discovery related to that issue is appropriate." Grosek v. Panther Transp., Inc., 251 F.R.D. 162, 165-66 (M.D. Pa. 2008); see also Renshaw v. Ravert, 82 F.R.D. 361, 363 (E.D. Pa. 1979) (Huyett, J.) ("[W]hen a plaintiff seeks punitive damages, the defendant's financial status becomes a relevant

consideration."). Thus, as with the other challenged litigation tactics, this decision was not objectively unreasonable or frivolous.

### B. Motivation

#### 1. The Parties' Contentions

According to Spurlock, Warren repeatedly told customers and competitors that Spurlock was "dishonest," "sneaky," sleazy," and a "slime pit." (Att'y Fees Mot. 11.) Spurlock contends that such behavior indicates that, in filing suit and aggressively litigating the case, Warren was improperly motivated by the desire to defame Spurlock and/or by greed. (Att'y Fees Mot. 11.)

Plaintiffs, however, respond that they acted reasonably during litigation, and that "[p]roof of improper motivation requires substantially more than hyperbole, conclusory and speculative statements, and pulling facts out of context to support assertions of questionable intentions." (Resp. 37.) Plaintiffs aver that Spurlock grossly mischaracterizes the record which includes only "[o]ne private, personal letter from Mr. Warren, intended for a friend with whom Mr. Warren had not communicated in years," that "demonstrate[s] nothing more than a litigant's typical expression of discontent and acrimony over an opposing litigant." (Resp. 38.) Plaintiffs further aver that it is Spurlock who "unnecessarily impugns James Warren's integrity with ad hominem attacks and personal invectives in his attempt to color this case with some improper motive." (Resp. 38.)

#### 2. Analysis

"[P]arties are improperly motivated only if they do not have a good faith intent to protect a valid interest, but rather a desire to discourage and financially damage a competitor by forcing it into costly litigation." Schiffer, 76 U.S.P.Q. 2d at 1496 (internal quotation marks omitted).

23

Here, rather than containing only one instance in which Warren stated to a friend that he disliked Spurlock, the record shows that Warren conceded that he repeatedly impugned Spurlock within the industry. At his deposition, when asked "[t]o whom have you called [Spurlock] dishonest," Warren responded, "Everyone I've spoken to since I learned of the Gogos book." (Warren Dep. 250:16-19, Att'y Fees Mot., Ex. D.) In addition, there is reason to question Plaintiffs' contention that they were motivated only by a desire to assert their own rights. As this Court previously found, Warren adamantly refused to settle the dispute amicably with Spurlock, refusing to negotiate as to a licensing fee, and filing suit years after Spurlock published the Gogos book. 645 F. Supp. 2d at 421, 428. Plaintiffs also demonstrated "sheer neglect" of their copyright, had not even determined ownership of all the asserted copyrights, and failed to assert their purported copyrights for twenty-two years. Id. at 407, 428. Moreover, "despite his self-professed intent to create [a similar] book, Warren ha[d] taken no significant steps to do so." Id. at 425. The Court, therefore, concludes that Warren possessed an improper motive, namely a desire to impugn and harm his hated competitor, Spurlock. This factor warrants significant weight..

### C. Compensation and Deterrence

#### 1. The Parties' Contentions

Spurlock contends that when Plaintiffs commenced this action, he was forced to either negotiate a settlement and stop printing and distributing the Gogos Book, thereby depriving the public of them, or defend his rights. (Att'y Fees Mot. 8.) According to Spurlock, had he lost, the "cost and administrative obstacles of securing sufficient licenses" would have "effectively destroy[ed]" his business and deterred others from defending their fair use rights, and from creating similar works, thereby disincentivizing artistic creation. (Att'y Fees Mot. 8-9.) As a

result, Spurlock concludes that the Copyright Act's goals of promoting the production of works such as his, and incentivizing parties to litigate meritorious defenses to copyright actions, are advanced by awarding him attorney's fees. (Att'y Fees Mot. 8.) Spurlock also avers that an attorney's fee award would deter individuals in Plaintiffs' position "from bringing questionable claims that have the effect of inhibiting the creation of such biographical works" in what was "not a close case." (Att'y Fees Mot. 9; Reply 9-10.) Spurlock laments that Plaintiffs' litigation has contributed to "staggering" copyright litigation costs. estimated to be on average and have as a median, over a million dollars per case. (Att'y Fees Mot. 9; <u>see also</u> Att'y Reply 3-5, 9-11.)

In contrast, Plaintiffs assert that there is no need to vindicate considerations of compensation or deterrence here, because Spurlock "naturally invited a lawsuit" by publishing his book without Plaintiffs' permission, and purposefully giving his book a similar name to <u>Famous Monsters</u>. (Pls.' Resp. 53-56.) As for deterrence, Plaintiffs contend that this case raised "difficult and subtle questions about the proper scope of copyright protection and the fair use doctrine," and that they took objectively reasonable positions necessary to demarcate the boundaries of copyright law. (Pls.' Resp. 52.) Plaintiffs conclude that an attorney's fee award would effectively take away "the keys to the courthouse" from future plaintiffs, forcing them to choose between losing their rights and being saddled with substantial fees, thereby inhibiting artistic creativity. (Pls.' Resp. 52-53.)

## 2. Analysis

The "ultimate aim" of the Copyright Act is "to stimulate artistic creativity for the general public good," 510 U.S. 517 527 (1994) (quotation marks omitted), or to put it another way, "[t]o promote the Progress of Science and useful Arts," "not to reward the labor of authors . . . . To

this end, copyright assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work." Feist, 499 U.S. at 349-50.

Fogerty took care to emphasize that in order to "enrich[] the general public through access to creative works, it is peculiarly important that the boundaries of copyright law be demarcated as clearly as possible." Fogerty, 510 U.S. at 527. Thus, "defendants who seek to advance a variety of meritorious copyright defenses should be encouraged to litigate them to the same extent that plaintiffs are encouraged to litigate meritorious claims of infringement." Id.

On the other hand, Plaintiffs are correct that courts have explained that because

 [a]ppropriation artists take other artists' work . . . . often (as in this case) . . . without giving credit to the original artist, the appropriation artists can expect that their work may attract lawsuits. They must accept the risks of defense, including the time, effort, and expenses involved. While that does not remove the appropriate artist from the protection of the statute, litigation is a risk he knowingly incurs when he copies the other's work.

Blanch, 485 F. Supp. 2d at 518; see also Silverstein v. Penguin Putnam Inc., 86 U.S.P.Q. 2d 1269, 1273 (S.D.N.Y. 2008) (finding "no compelling reason to compensate" the defendant publisher, because after the plaintiff rejected the defendant's offer, the defendant "hired an outside editor who . . . photocopied the pages of [the plaintiff]'s book and rearranged them to create a chapter of the competing publication").

Here, ownership of the underlying works was far from apparent. As the Court explained in detail in granting Spurlock summary judgment, this is not a case in which "Spurlock knew Plaintiffs owned the copyrights but went ahead anyway"; rather, "most of the images used by Spurlock . . . were not copies of the magazine covers, but were copies of the art used as the background of the magazine covers. For these images, it is by no means clear, even after

discovery, who owns the rights . . . ." 645 F. Supp. 2d at 422. Although Spurlock surely

suspected that Plaintiffs might own the works, given that he approached Warren in the hopes of

procuring permission to use the works, the Court gave significant weight to the fact that Spurlock

aimed to resolve the dispute without resorting to litigation and that Warren waited until two years

after Spurlock successfully published the book before filing suit.

The Court is persuaded that the need for compensation and deterrence, the primary goals

of the Copyright Act outweigh any risk of litigation that Spurlock needed to assume by

appropriating another's work, and favor an attorney's fee award. Although the Court has already

explained that this is not a case involving objectively unreasonable or frivolous fair use

arguments on the part of Plaintiffs, their decision to file suit in spite of "Warren's complete

failure to exploit his copyrights for approximately 22 years," id. at 428, and their questionable

strategy in litigating their case, such as bringing a meritless punitive damages claim, greatly

exaggerating his auditory impairment, and misrepresenting the level to which Warren attempted

to pitch a book similar to the Gogos book, all constitute behavior that warrant deterrence.

Moreover, defendants such as Spurlock, in defending against such behavior and litigation

positions, should be compensated to a degree in order to avoid stifling future artistic creativity.

As a result, the Court concludes that awarding Spurlock some of his attorney's fees would meet

the Copyright Act's aim of "enriching the general public through access to creative works."

Fogerty, 510 U.S. at 527.

### D. Consideration of All Lieb Factors

As detailed above, although Spurlock has presented evidence indicating that Plaintiffs,

and Warren in particular, possessed improper motivations, and although an award would further

the goals of the Copyright Act, it is less clear whether the remaining <u>Lieb</u> factors also favor an award of attorney's fees.  Various of Plaintiffs' claims and arguments were objectively unreasonable, but several others were not; none rose to the level of being frivolous.  Based in large part upon its finding of Plaintiffs' improper motivation, the Court concludes that taken together as a whole, the <u>Lieb</u> factors weigh in favor of Spurlock, albeit only for litigation stemming from Plaintiffs' claims and litigation positions identified above as being objectively unreasonable.

The Court finds instructive the Sixth Circuit's decision in <u>Bridgeport Music, Inc. v. WB Music Corp.</u>, 520 F.3d 588, 593 (6th Cir. 2008),which affirmed the district court's grant of a partial fee award notwithstanding the fact that the "case presents one of the rare instances in which a district court orders a party to pay attorneys' fees and costs in spite of finding that the party advanced an objectively reasonable legal claim or theory."  The Sixth Circuit emphasized that "there is no single factor that must weigh in favor of an award of fees and costs–i.e., no factor is a necessary condition," and that "objective unreasonableness is not an impenetrable shield against fees and costs."  <u>Id.</u>  In <u>Bridgeport</u>, the plaintiffs had engaged in "overly aggressive litigation tactics" including "pressing a futile claim," "abusing the summary judgment process by submitting . . . immaterial and argumentative assertions," and "engaging in discovery abuses" and "sharp pre-trial practices."  <u>Id.</u> (internal quotation marks omitted).  The Sixth Circuit then determined that "the district court's decision to award fees and costs is bolstered by its significant reduction of the requested amount."  <u>Id.</u> at 595-56 (internal quotation marks omitted).  <u>See also</u> <u>Lotus Dev. Corp. v. Borland Int'l, Inc.</u>, 140 F.3d 70, 76 n.5 (1st Cir. 1998) (noting "that courts have exercised their discretion to tailor fee awards in light of the behavior of the parties during

litigation" and collecting examples of such cases); <u>Agee v. Paramount Commc'ns, Inc.</u>, 869 F. Supp. 209, 211-12 (S.D.N.Y. 1994) (awarding a partial attorney's fee award for two procedural steps the non-prevailing plaintiff took during the course of the litigation, the first of which "only served to drive up the costs of litigation and to harass defendant," and the second of which, was "under, at best, dubious circumstances").

Here, Warren's bad faith, along with several objectively unreasonable claims and litigation positions, and the corresponding need to deter such behavior and to compensate Spurlock for opposing such claims and positions, warrants a partial fee award. The Court will only permit Spurlock partial recovery of his attorney's fees. Based on the factors discussed above and the entire factual record, the Court has determined that the proper amount of attorneys fees to be awarded to Spurlock is 35 % of the total attorney's fees which Spurlock spent in preparing for and defending this case.

## V.     Conclusion

For the reasons detailed above, the Court will grant in part and deny in part Spurlock's Request for Attorney's Fees. An appropriate Order follows.

O:\CIVIL 07-08\08-3399 Warren v. Spurlock\Warren v. Spurlock - Mem. Copyright Atty Fees.wpd